**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JONI GOLDYN,
            *Petitioner-Appellant,*

            v.

LOY HAYES,
            *Respondent-Appellee.*

No. 04-17338

D.C. No.
CV-97-01769-RLH

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, District Judge, Presiding

Argued and Submitted
October 21, 2005—San Francisco, California

Filed February 1, 2006

Before: Robert R. Beezer and Alex Kozinski, Circuit Judges,
and Cormac J. Carney,* District Judge.

Opinion by Judge Kozinski

---

*The Honorable Cormac J. Carney, United States District Judge for the
Central District of California, sitting by designation.

## COUNSEL

Franny A. Forsman, Federal Public Defender, and Paul G. Turner, Assistant Federal Public Defender, Las Vegas, Nevada, for the petitioner-appellant.

Brian Sandoval, Attorney General; Rene L. Hulse, Senior Deputy Attorney General; and Victor Hugo Schulze II, Deputy Attorney General, Las Vegas, Nevada, for the respondent-appellee.

## OPINION

KOZINSKI, Circuit Judge:

Petitioner spent 12 years in prison for conduct that is not a crime. We vacate her conviction pursuant to *Jackson* v. *Virginia*, 443 U.S. 307 (1979).

**Facts**

In November 1987, Joni Goldyn opened checking and savings accounts with the Nevada Federal Credit Union (NFCU). Generous to a fault, NFCU also showered Goldyn with a $1,000 loan, a $500 line of credit attached to her checking account, a credit card and a "check guarantee card." By January 1988, Goldyn had depleted the funds in her accounts, used up most of her $500 line of credit, and accumulated various bank fees, resulting in a net negative balance. But Goldyn continued writing checks, and merchants continued accepting them, presumably relying on her check guarantee card. More importantly, NFCU continued covering her checks, as the check guarantee card obligated it to do. As NFCU's collection officer testified at trial: "If a member uses a check guarantee card with the check, the bank is liable, and we do have to honor those checks."

Goldyn was convicted by a jury of five counts of Drawing and Passing Checks with Insufficient Funds on Deposit, in violation of Nev. Rev. Stat. 205.130. Because she had previously been convicted of three felonies and one gross misdemeanor—all fraud related—she was sentenced as a habitual criminal to five life sentences. After twelve years in prison, she was released and placed on lifetime parole.[1] On federal habeas, Goldyn presents a simple argument: If the bank was obligated to cover them, then she can't have written bad checks.

---

[1]Although Goldyn was released, we retain jurisdiction over her habeas petition because the petition was filed while she was imprisoned. *See United States* v. *Spawr Optical Research, Inc.*, 864 F.2d 1467, 1470 (9th Cir. 1988). In any event, she remains in "custody" for purposes of habeas jurisdiction while she is on parole. *See Jones* v. *Cunningham*, 371 U.S. 236, 243 (1963). Further, Goldyn's case is not moot because "the adverse consequences of [her] criminal conviction remain." *Spawr Optical Research*, 864 F.2d at 1470; *see Chaker* v. *Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005) (citing *Chacon* v. *Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994), for the proposition that there is an "irrefutable presumption that collateral consequences result from any criminal conviction").

**Analysis**

**[1]** Our analysis begins and ends with the statutory text. The statute under which Goldyn was convicted is violated when "a person . . . willfully, with an intent to defraud, draws or passes a check or draft to obtain [money or property] . . . when the person has insufficient money, property *or credit* with the drawee of the instrument to pay it in full upon its presentation." Nev. Rev. Stat. 205.130(1) (emphasis added). "Credit" is further defined as "an arrangement or understanding with a person, firm, corporation, bank or depositary for the payment of a check or other instrument." *Id.* at 205.130(4).

It is undisputed that Goldyn had insufficient funds in her account to cover the five checks she wrote. But it is also undisputed that, at the time Goldyn wrote the checks, she was in possession of a check guarantee card from NFCU.² This card represented NFCU's commitment to merchants accepting Goldyn's checks that it would cover the checks even if Goldyn had insufficient funds in her account to cover the checks herself. As the Nevada Supreme Court recognized, "[t]he credit union paid the checks because [Goldyn's] use of a check guarantee card to draw the checks obligated it to do so." In fact, even though Goldyn's purchases totaled more than her $500 line of credit, and even though Goldyn already had a negative balance in her account, NFCU covered all five checks, and the merchants lost no money.

**[2]** Over the twelve years she spent in prison, Goldyn asserted her innocence seven times before three courts.³ Yet

---

²NFCU allegedly sent Goldyn a letter a few days before Goldyn wrote the five checks at issue, informing her that her check guarantee account was being closed due to excessive overdrafts. But the letter was sent "return receipt requested," and no receipt was ever returned. Goldyn claims she never received the letter. In any event, Goldyn's account obviously had not yet been closed, as NFCU continued to cover her checks.

³The Nevada trial court entered its amended judgment of conviction in April 1991. The Nevada Supreme Court dismissed Goldyn's direct appeal

no court appears to have taken her argument seriously. The Nevada Supreme Court rejected Goldyn's argument with the following incomplete analysis:

> The elements of the crime of issuing a check against insufficient funds are: 1) with the intent to defraud; 2) making or passing a check for the payment of money; 3) without sufficient funds in the drawee institution to cover the check in full upon presentation. Appellant opened her checking account under an assumed name. Appellant received cash or merchandise in return for each of the checks at issue, and did not have sufficient funds in her account to cover the checks. Appellant's check guarantee card carried a $500 line of credit, but appellant's overdrafts far exceeded that amount. The credit union paid the checks because appellant's use of a check guarantee card to draw the checks obligated it to do so. Although the payee of the checks was not injured, the credit union was injured by having to cover appellant's bad checks. The jury could reasonably infer from the evidence presented that appellant, with an intent to defraud, drew and passed each of the checks at issue without having sufficient funds in the drawee institution to cover the checks. (Citations omitted.)

The state court correctly identified that Goldyn "did not have sufficient funds in her account to cover the checks." But standing alone, this is not a crime; the statute is only violated

---

in March 1992. The state trial court denied her petition for post-conviction relief in September 1994, and her state habeas petition in August 1995. Goldyn appealed both denials to the Nevada Supreme Court, which denied both in November 1997. Finally, Goldyn filed a federal habeas petition, which the United States District Court for the District of Nevada denied in July 2004.

if she wrote the checks without sufficient funds "or credit."[4] Nev. Rev. Stat. 205.130(1). Thus, Goldyn's undisputed lack of funds is of no consequence if she had sufficient *credit* to cover the checks.

[3] Although the state court recognized that Goldyn's check guarantee card "obligated" NFCU to pay Goldyn's checks, it apparently failed to recognize that obligation as a form of credit. Instead, the state court focused on Goldyn's $500 credit limit, even though undisputed evidence in the record demonstrates that the $500 "limit" did not cap the bank's obligations under the check guarantee card. At trial, NFCU's collection officer explained this very clearly:

> Q: The five hundred dollar line of credit was, you previously testified, attached to [Goldyn's] checking account. Is that right?
>
> A: That's correct.
>
> Q: And is that a type of overdraft protection?
>
> A: Yes, it is.
>
> Q: And could a member extend the credit line beyond five hundred dollars without approval from the bank?

---

[4]The information under which Goldyn was charged also lacked the critical words "or credit." This raises another serious constitutional issue. *See United States* v. *Debrow*, 346 U.S. 374, 376 (1953) ("An indictment is required to set forth the elements of the offense sought to be charged. The true test of the sufficiency of an indictment is . . . whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet . . . ." (internal quotation marks omitted)). But Goldyn has never challenged the sufficiency of the information on this ground, so we need not address it. We mention it merely as another example of inexcusable sloppiness in the handling of this case.

A:   They could.

Q:   How?

A:   By exceeding the amount of five hundred dollars and continue [sic] to write checks.

The state court overlooked the fact that, by giving Goldyn a check guarantee card, NFCU had obligated itself to continue doling out money to cover her checks, even after that so-called limit was surpassed.[5]

The state court also mentioned the irrelevant fact that Goldyn opened her checking account under an assumed name. Had Goldyn been charged with defrauding NFCU into giving her the check guarantee card, her representations when she opened the account would, of course, have been relevant. But Goldyn was charged with writing bad checks, a completely different crime with different potential victims—the merchants who accepted the checks, not the bank. The bottom line is that the checks Goldyn wrote were not bad, and the merchants who accepted her checks were not injured; they were paid in full.

Finally, the state court's observation that "the credit union was injured by having to cover appellant's bad checks" reveals a misunderstanding of both the crime of conviction and the concept of a check guarantee card. The crime of writ-

---

[5]It is possible, of course, that NFCU covered Goldyn's purchases with no intention of being repaid. In common parlance, this would be known as a "gift." Although such a gift would certainly have been generous, we will not presume the credit union intended such generosity absent any evidence to that effect. In any event, NFCU's decision to cover Goldyn's checks cannot be described as anything other than a "gift" or "credit"—either it intended for Goldyn to repay the money (in which case it was extending her credit), or it didn't (in which case it was giving her a gift of money). In either case, Goldyn's checks were covered by "money, property or credit" as specified in Nev. Rev. Stat. 205.130(1).

ing bad checks protects merchants from trading their wares for worthless paper; it does not protect a financial institution from making unwise loans. A financial institution that has given its account holder a check guarantee card is not "injured" when it is forced to cover her overdrawn checks—that's the entire purpose of a check guarantee card. The financial institution is only injured when the money it lends by covering an account holder's checks—the *credit* it has extended her—is not repaid. But that "injury" is part of the credit risk a financial institution assumes as its everyday business; when it chooses to guarantee its account holder's overdrawn checks, it becomes her unsecured creditor. NFCU can try to collect its money from Goldyn using the debt collection procedures it would employ for any other defaulted loan, including a civil lawsuit. But failure to repay a loan is not a crime; the days of imprisoning insolvent debtors are long gone. *See, e.g.*, U.S. Const. amend. XIII (1865); Nev. Const. art. I, § 14 (1864).

The check guarantee card was a private agreement between the Nevada Federal Credit Union and Goldyn: NFCU agreed to put its own balance sheet behind Goldyn's checks so that merchants would feel comfortable accepting them, and Goldyn agreed to repay NFCU with interest. This is a service that financial institutions offer their customers to make it easier for them to negotiate their checks; presumably they are remunerated for this service, and the risk associated with it, by charging interest. NFCU could have conducted a background check on Goldyn, or required collateral from her, before entering into such a risky arrangement. The wisdom of its decision not to do so should be of no concern to the state prosecutor's office or the criminal courts. Of course, if Goldyn fraudulently represented herself to NFCU in order to qualify for the check guarantee card, she might have been prosecuted for defrauding the bank. But the state has the responsibility of charging her with the right crime—fraud against the bank, not writing bad checks. And Goldyn cannot

be sent to prison for a crime she didn't commit because she might be guilty of a different crime altogether.

**[4]** "Perhaps some would say that [Goldyn's] innocence is a mere technicality, but that would miss the point. In a society devoted to the rule of law, the difference between violating or not violating a criminal statute cannot be shrugged aside as a minor detail." *Dretke* v. *Haley*, 541 U.S. 386, 399-400 (2004) (Kennedy, J., dissenting). No check Goldyn wrote that was backed by her check guarantee card—representing the bank's commitment to pay Goldyn's checks in full, regardless of the funds in her account—could possibly have been a bad check. And, because "there is no factual basis for [Goldyn's] conviction . . . it follows inexorably that [she] has been denied due process of law. *Thompson* v. *Louisville*, 362 U.S. 199 (1960); *Jackson* v. *Virginia*, 443 U.S. 307 (1979)." *Haley*, 541 U.S. at 397 (Stevens, J., dissenting); *see also id.* at 395 (majority opinion) (citing *In re Winship*, 397 U.S. 358, 364 (1970), for the proposition that due process requires proof of each element of a crime beyond a reasonable doubt).

**[5]** No rational trier of fact could have found that Goldyn committed the crime of writing bad checks as defined by Nevada law. *See Jackson*, 443 U.S. at 319. And no rational judicial system would have upheld her conviction. *See* 28 U.S.C. § 2254(d)(1). We are saddened and disappointed that the state supreme court unanimously affirmed a conviction carrying multiple life sentences based on such cursory and inadequate review of the record in light of the applicable statute.

*    *    *

The Nevada Federal Credit Union probably made a foolhardy decision when it gave Goldyn a check guarantee card and lent her money. And Goldyn breached her private agreement with NFCU when she failed to repay the money it loaned her. But the state cannot remedy NFCU's error in

judgment, or avenge Goldyn's breach of contract, by convicting her of a crime she didn't commit. Had the Nevada courts and prosecutor's office taken more seriously their "obligation to serve the cause of justice," *United States* v. *Agurs*, 427 U.S. 97, 111 (1976), Goldyn would not have spent twelve years behind bars for conduct that is not a crime.[6]

**[6]** We remand to the district court for the entry of a judgment granting the petition for writ of habeas corpus and directing the clerk to immediately issue an unconditional writ of habeas corpus vacating Goldyn's conviction and ordering expungement of all state and federal records thereof.

We direct the clerk of this court to issue the mandate forthwith.

**REVERSED.**

---

[6]Because we are granting Goldyn's habeas petition for the reasons expressed above, we do not consider her numerous other claims, some of which raise similarly significant issues that cast further doubt on the state's commitment to the pursuit of justice in this case.