**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| **JONI GOLDYN**, | No. 04-17338 |
| Petitioner - Appellant, | D.C. No. CV-97-01769-RLH |
| v. | |
| **LOY HAYES**, | **AMENDED OPINION** |
| Respondent - Appellee. | |

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, District Judge, Presiding

Argued and Submitted October 21, 2005
San Francisco, California

Filed February 1, 2006
Amended April 11, 2006

Before: **BEEZER** and **KOZINSKI**, Circuit Judges, and **CARNEY**,[*] District
Judge.

**KOZINSKI**, Circuit Judge:

Petitioner spent 12 years in prison for a crime she didn't commit. We

---

[*] The Honorable Cormac J. Carney, United States District Judge for the
Central District of California, sitting by designation.

vacate her conviction pursuant to <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307 (1979).

**Facts**

In November 1987, Joni Goldyn opened checking and savings accounts with the Nevada Federal Credit Union (NFCU). Generous to a fault, NFCU also showered Goldyn with a $1,000 loan, a $500 line of credit attached to her checking account, a credit card and a check guarantee card. The back of the latter card read as follows:

> This credit union guarantees payment of cardholder's checks drawn prior to the expiration date by the person whose name appears on the face of this card subject to the following conditions: 1) Check amount shall not exceed $100 cash or $500 for merchandise; 2) Card number and expiration date must appear on the check . . . .

The inscription on the back of the card also imposed certain obligations on the cardholder, triggered "[b]y signing and using the card":

> 3) Pay the credit union for checks guaranteed with this card if the cardholder's account is insufficient; 4) To surrender this card upon the credit union's request.

The expiration date on the front of the card was November 1989.

By January 1988, Goldyn had depleted the funds in her accounts, used up most of her $500 line of credit and accumulated various bank fees, resulting in a net negative balance. But Goldyn continued writing checks, and merchants

continued accepting them, presumably relying on her check guarantee card. More importantly, NFCU continued covering her checks, as the check guarantee card obligated it to do. As NFCU's collection officer testified at trial: "If a member uses a check guarantee card with the check, the bank is liable, and we do have to honor those checks."

Goldyn was convicted by a jury of five counts of Drawing and Passing Checks with Insufficient Funds on Deposit, in violation of Nev. Rev. Stat. 205.130. Because she had previously been convicted of three felonies and one gross misdemeanor—all fraud related—she was sentenced as a habitual criminal to five life sentences. Goldyn asserted her innocence seven times before three courts, but to no avail.[1] After taking twelve years of Goldyn's life, the state finally released her on lifetime parole.[2] On federal habeas, Goldyn presents the same

---

[1] The Nevada trial court entered its amended judgment of conviction in April 1991. The Nevada Supreme Court rejected Goldyn's direct appeal in March 1992. The state trial court denied her petition for post-conviction relief in September 1994, and her state habeas petition in August 1995. Goldyn appealed both denials to the Nevada Supreme Court, which affirmed both in November 1997. Finally, Goldyn filed a timely federal habeas petition in July 1998, which the United States District Court for the District of Nevada didn't deny until July 2004.

[2] We retain jurisdiction over her habeas petition because the petition was filed while she was imprisoned. See United States v. Spawr Optical Research, Inc., 864 F.2d 1467, 1470 (9th Cir. 1988). In any event, she remains in "custody"

(continued...)

simple argument she had presented to the state courts: If the bank was obligated to cover her checks, then she can't be convicted of having written bad checks.

**Analysis**

**1.** Goldyn was convicted of violating Nev. Rev. Stat. 205.130(1), which makes it a criminal offense for "a person [to] . . . willfully, with an intent to defraud, draw[] or pass[] a check or draft to obtain [money or property] . . . when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon its presentation." The elements of this offense are no mystery: To convict Goldyn, the state had to prove beyond a reasonable doubt that she (1) acted willfully and with an intent to defraud; (2) passed a check in exchange for cash, goods or services; and (3) was unable to cover the check with any of the following: (a) money, (b) property or (c) credit with NFCU.[3]

---

[2](...continued)
for purposes of habeas jurisdiction while she is on parole. See Jones v. Cunningham, 371 U.S. 236, 243 (1963). Further, Goldyn's case is not moot because "the adverse consequences of [her] criminal conviction remain." Spawr Optical Research, 864 F.2d at 1470; see Chaker v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005) (citing Chacon v. Wood, 36 F.3d 1459, 1463 (9th Cir. 1994), for the proposition that there is an "irrefutable presumption that collateral consequences result from any criminal conviction").

[3] The Nevada Supreme Court has occasionally referred to the third element of the statute simply as a lack of "funds." See, e.g., Garnick v. First Judicial Dist.

(continued...)

It is uncontested that Goldyn passed five checks to various merchants in exchange for items of value, and that she had insufficient money or property in her NFCU accounts to cover the checks. We can further assume for the sake of argument that Goldyn intended to defraud <u>someone</u> when she passed those checks, whether it have been the merchants or the bank: She knew she had insufficient money in her account to pay the merchants and, should the bank pay the merchants for her, she presumably[4] had no intention of repaying the bank. Thus, we take it as

---

[3](...continued)
<u>Court</u>, 407 P.2d 163, 165 (Nev. 1965) (a case where sufficiency of credit was not an issue). A superficial review of cases such as <u>Garnick</u> might lead to the facile conclusion that the Nevada Supreme Court eliminated the terms "property or credit" from Nev. Rev. Stat. 205.130(1), and that the statute is violated whenever an account holder writes a check not covered by funds in his account. This, of course, would make criminals out of the many law-abiding people who occasionally write checks backed by credit rather than cash. Had the state pressed this strained interpretation of Nev. Rev. Stat. 205.130(1), we would have hesitated in attributing to the Nevada Supreme Court such a radical rewriting of the statute based only on casual phrases clipped from cases where the issue is not even presented. But the state made no such argument, and Nevada caselaw subsequent to <u>Garnick</u> discloses that the statute still means what it says. <u>See</u> <u>Nguyen</u> v. <u>State</u>, 14 P.3d 515, 517 (Nev. 2000) (listing the elements of the offense just as the statute defines them, including insufficient credit). Indeed, in this very case, the Nevada Supreme Court considered whether Goldyn had sufficient credit with NFCU under her $500 credit line to be absolved of the offense, <u>see</u> pp. 6–7 <u>infra</u>, an analysis that would have been superfluous had the court taken the view that credit was no longer a sufficient basis for covering checks in Nevada.

[4] We say presumably because we are aware of no evidence in the record as to Goldyn's intent to repay the bank. This is not at all surprising, given that

(continued...)

given that the state met its burden on elements 1, 2, 3(a) and 3(b).

Finally, with respect to element 3(c), it is undisputed that at the time Goldyn wrote the checks at issue, she had already nearly exceeded her $500 line of credit. Thus, the only remaining question is whether Goldyn's check guarantee card was an <u>additional</u> form of credit extended to her by NFCU, as that term is defined by Nev. Rev. Stat. 205.130(4) (defining "credit" as "an arrangement or understanding with a person, firm, corporation, bank or depositary for the payment of a check or other instrument"). If it was, then the checks were covered by Goldyn's credit and the state did not prove element 3(c) of the crime she was charged with. <u>See</u> <u>Jackson</u>, 443 U.S. at 318–19, 323–24.

**2.** We start our analysis with the state court's findings, to which we owe great deference. <u>See</u> 28 U.S.C. § 2254(e)(1). This is everything the Nevada Supreme Court had to say in upholding Goldyn's conviction:

> Appellant opened her checking account under an assumed name. Appellant received cash or merchandise in return for each of the

---

[4](...continued)
Goldyn was charged with writing bad checks and intent to repay the bank is not an element of that offense.

We note that Goldyn herself bears some of the blame for these errors because she chose to represent herself at trial, perhaps tempting the prosecution into overreaching.

checks at issue, and did not have sufficient funds in her account to cover the checks. Appellant's check guarantee card carried a $500 line of credit, but appellant's overdrafts far exceeded that amount. The credit union paid the checks because appellant's use of a check guarantee card to draw the checks obligated it to do so. Although the payee of the checks was not injured, the credit union was injured by having to cover appellant's bad checks. The jury could reasonably infer from the evidence presented that appellant, with an intent to defraud, drew and passed each of the checks at issue without having sufficient funds in the drawee institution to cover the checks. (Citations omitted.)

This passage seems to presuppose that Goldyn's check guarantee card and her $500 line of credit were one and the same, and therefore that the check guarantee protection was capped at an aggregate of $500. Checks written after that limit was exceeded were, under this view, not covered by Goldyn's credit. We construe the Nevada Supreme Court's ruling as containing an implicit finding to that effect.[5]

However, the state court's terse analysis also contains an explicit finding: "The credit union paid the checks [that exceeded Goldyn's $500 line of credit] because

---

[5] We are not convinced that we are bound by a state court's implicit findings under AEDPA. Indeed, deference to state court implicit factfinding would likely vitiate the function of federal courts on habeas, because the state could always point to some "implicit" finding by the state court to fill in a whole variety of constitutional defects. Nevertheless, we will presume—while explicitly not deciding—that a federal court reviewing a state court's judgment on habeas may, at least in certain circumstances, be required to give deference to state court factual findings not explicitly made, but nonetheless implicit in the state court's judgment. We will assume the state court's implicit finding is correct unless clear and convincing evidence proves otherwise. See 28 U.S.C. § 2254(e)(1).

appellant's use of a check guarantee card to draw the checks obligated it to do so." If the credit union's obligation to cover the checks grew out of a separate credit arrangement with Goldyn, then this explicit finding would be inconsistent with the implicit finding that Goldyn had no credit to cover the checks. We thus turn to the record to determine which of the findings find support there.

As discussed above, everyone agrees that Goldyn had insufficient money in her account, and insufficient credit left on her $500 line of credit, to cover the checks. Everyone further agrees that Goldyn was in possession of a check guarantee card from NFCU at the time she wrote the checks at issue.[6] The

---

[6] NFCU allegedly sent Goldyn a letter at about the time Goldyn wrote the five checks at issue, informing her that her check guarantee account was being closed due to excessive overdrafts. The letter was sent "return receipt requested," which ensures a sender "proof of delivery." See http://www.usps.com/send/waystosendmail/extraservices/returnreceiptservice.htm ("A mailer purchasing return receipt service . . . receive[s] a green postcard with the recipient's actual signature."). But no such proof was ever returned, and Goldyn claims she never received the letter because NFCU had the wrong address. In fact, when NFCU sent Goldyn another return receipt letter a month later—to a different address in a different state—telling her to make payments on her account, NFCU did receive proof of service. All of the checks at issue in this case were written before this second letter was mailed.

In any event, Goldyn's account obviously had not yet been closed at the time she wrote the five checks at issue: Two of the checks were written before even the first letter threatened to close Goldyn's account, and NFCU continued to cover all five checks even after it had sent the letter. Nowhere in its opinion does the Nevada Supreme Court find that Goldyn's account had been closed at the time

(continued...)

question then is whether the check guarantee card merely reflected the $500 line of credit (which Goldyn had exhausted), or whether it represented an entirely separate credit arrangement, whereby the bank obligated itself to cover Goldyn's checks, regardless of her primary $500 credit line.[7] In answering this question, we begin with the terms of the check guarantee card itself, quoted above. See p. 2 supra. Among Goldyn's obligations as written on the card is the following: "Pay the credit union for checks guaranteed with this card if the cardholder's account is insufficient." This promise to repay would, of course, be unnecessary if Goldyn were merely drawing down her credit line. The credit line, after all, already involved a promise to repay; the inclusion of a separate promise to repay clearly suggests a separate contract between Goldyn and the bank.

Furthermore, the check guarantee card is not, by its terms, limited to $500

---

[6](...continued)
she wrote the checks; to the contrary, the court found that the check guarantee card was still in operation. See pp. 6–7 supra.

[7] It is not at all unusual for a financial institution to have more than one credit arrangement with the same customer. In Goldyn's case, for example, she had at least three such arrangements, putting aside the check guarantee card: her $1000 loan, the $500 line of credit and a credit card, each of which represented a separate obligation on her part. Other customers might also have a mortgage, a commercial loan, a letter of credit and a variety of other such arrangements. Each would, of course, be governed by its own terms and conditions and exhausting one would not necessarily exhaust any of the others.

of aggregate credit, as it would have to be if it were covered only by Goldyn's line of credit. Rather, the $500 limit described on the back of the card applies, as stated, to the "[c]heck amount." And the card speaks of covering "the cardholder's check*s*" (emphasis added), each of which could be for up to $100 in cash or $500 in merchandise. The agreement does not limit the number of checks the account holder may write, nor does it reference Goldyn's line of credit. And multiple checks of $500 each would, of necessity, exceed Goldyn's $500 line of credit.[8]

The Nevada Supreme Court in Goldyn's case, in fact, recognized that the bank was obligated to pay the checks, even though Goldyn's line of credit had been exhausted: "The credit union paid the checks because [Goldyn's] use of a check guarantee card to draw the checks obligated it to do so." P. 7 supra. And

---

[8] Indeed, a check guarantee card that is subject to an aggregate credit limit would be worthless because merchants accepting the card would have no way of knowing how much credit the cardholder has, and how many other checks he has written against that line of credit. The whole point of a check guarantee card is to reassure merchants that the checks will be covered, regardless of the state of the cardholder's account. The card tells merchants that they can accept checks (up to the amounts stated on the card) and those checks will be paid, whether or not the check-writer has funds to cover them. A check guarantee card that is subject to a preset aggregate credit limit would provide no such assurance, because merchants would have no way of knowing whether the check-writer had exhausted his line of credit, just as they have no way of knowing whether he has cash in his account to cover the checks.

the court had a solid basis for this factual finding—the NFCU collection officer that the prosecutor called to the stand gave very clear, uncontested testimony on the point:

> Q:  The five hundred dollar line of credit was, you previously testified, attached to [Goldyn's] checking account.  Is that right?
>
> A:  That's correct.
>
> Q:  And is that a type of overdraft protection?
>
> A:  Yes, it is.
>
> Q:  And could a member extend the credit line beyond five hundred dollars without approval from the bank?
>
> A:  They could.
>
> Q:  How?
>
> A:  By exceeding the amount of five hundred dollars and continue [sic] to write checks.

Thus, NFCU conceded that by giving Goldyn a check guarantee card, it had obligated itself to dole out money to cover Goldyn's checks, regardless of the state of her account.  As the NFCU collection officer also testified, "If a member uses a check guarantee card with the check, the bank is liable, and we do have to honor those checks."  Nor was this simply a unilateral accommodation on that part of the bank designed to maintain the bank's goodwill with the merchants.  The check

guarantee card is a contract between the bank and Goldyn, with the merchants who accept checks in reliance on the card as intended third party beneficiaries. By signing and using the card, Goldyn obligated herself to repay the bank for covering checks that were not covered by funds in her account.

Recall Nevada's definition of "credit": "an arrangement or understanding with a person, firm, corporation, bank or depositary for the payment of a check or other instrument." Nev. Rev. Stat. 205.130(4). Looking at the plain language of this definition, Goldyn's check guarantee card must qualify as credit: By signing and using the card, Goldyn entered into an "understanding" with NFCU that it would pay her checks even though she had insufficient funds in her account to cover them herself. Or, to look at it another way, by giving Goldyn the card, NFCU had entered into an "arrangement" to pay her checks, and Goldyn had promised to repay the amounts so advanced. The Nevada Supreme Court's explicit factual finding and the uncontested evidence in the record seem to lead inexorably to this conclusion. Its implicit factual finding, <u>see</u> p. 7 <u>supra</u>, that Goldyn's check guarantee card was subject to an aggregate cap equal to the $500 limit on her credit line finds no support in the record.

**3.** We turn now to the Nevada Supreme Court's reasons for upholding

Goldyn's conviction. The court offered four explanations for its surprising holding: (1) "Appellant opened her checking account under an assumed name." (2) "Appellant received cash or merchandise in return for each of the checks at issue, and did not have sufficient funds in her account to cover the checks." (3) "Appellant's check guarantee card carried a $500 line of credit, but appellant's overdrafts far exceeded that amount." (4) "Although the payee of the checks was not injured, the credit union was injured by having to cover appellant's bad checks." See pp. 6–7 supra. None of these reasons is sufficient to uphold Goldyn's conviction.

That Goldyn opened her checking account under an assumed name is entirely beside the point, given the crime Goldyn was charged with. Had Goldyn been charged with defrauding NFCU into giving her the check guarantee card, her representations when she opened the account would, of course, have mattered. But Goldyn was charged with writing bad checks, a completely different crime. Goldyn's dishonesty when opening her account does not alter the "arrangement or understanding" she had with NFCU as a result of her check guarantee card, and is thus irrelevant to that element of the offense. The fact that Goldyn may have engaged in fraud in obtaining credit does not vitiate the fact that she had credit at the time she wrote her checks. The Nevada Supreme Court recognized as much

when it noted that Goldyn's line of credit had been exhausted. Had Goldyn's fraud in obtaining the credit rendered her credit line a nullity, then it would hardly have mattered that the credit line was exhausted.

Of course, deceiving the bank may be evidence of an intent to defraud, but that is a wholly distinct element of the statute under which Goldyn was convicted. See p. 4 supra (element 1). We are assuming that Goldyn did have an intent to defraud, see p. 5 supra, but the state also had to prove that she did not have credit to cover the checks when she wrote them. For Goldyn to have been convicted, the state needed to present evidence that she committed each and every statutory element of the crime with which she was charged. See Jackson, 443 U.S. at 316; In re Winship, 397 U.S. 358, 364 (1970).

Next, the state court noted that Goldyn "did not have sufficient funds in her account to cover the checks." But standing alone, this is not a crime; the statute is only violated if she wrote the checks without sufficient funds "or credit." Nev. Rev. Stat. 205.130(1).[9] Indeed, the check guarantee card contemplates that the

---

[9] The information under which Goldyn was charged also lacked the critical words "or credit." This raises another serious constitutional issue. See United States v. Debrow, 346 U.S. 374, 376 (1953) ("An indictment is required to set forth the elements of the offense sought to be charged. The true test of the sufficiency of an indictment is . . . whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be

(continued...)

check-writer may not have sufficient funds in her account, as it obligates the account holder to "[p]ay the credit union for checks guaranteed with this card if the cardholder's account is insufficient." Writing checks with insufficient funds in the checking account thus is a contemplated circumstance of the agreement between Goldyn and the bank, and can hardly be proof of any illegality on Goldyn's part. Goldyn's undisputed lack of funds is of no consequence if she had sufficient <u>credit</u> to cover the checks, the very question at issue in this case.

Similarly, the court's next statement regarding the insufficiency of Goldyn's $500 line of credit is merely background information; it says nothing about whether the check guarantee card constitutes a separate and distinct form of credit. For the reasons explained above, the record is perfectly clear that the $500 limit on Goldyn's line of credit in no way limited the bank's obligations under the check guarantee card, which entitled Goldyn to write multiple checks, each of which could be for up to $500. Nor was Goldyn's obligation to repay the bank limited to amounts drawn against her line of credit. She had a separate contractual obligation to repay all funds advanced by the bank to cover her checks, which

---

[9](...continued) prepared to meet . . . ." (internal quotation marks omitted)). But Goldyn has never challenged the sufficiency of the information on this ground, so we need not address it.

could well exceed $500. As noted above, to the extent that the Nevada Supreme Court found there to be an aggregate $500 limit attached to the check guarantee card, such a finding is contradicted by the record. See 28 U.S.C. § 2254(e)(1).

Finally, the Nevada Supreme Court stated that the credit union had been injured by having to cover Goldyn's checks. As an initial matter, it is not at all clear that a financial institution that has given its account holder a check guarantee card can be injured when it is forced to cover overdrawn checks—that's one of the circumstances contemplated by the check guarantee card, which provides that the cardholder will reimburse the credit union for checks passed when "the cardholder's account is insufficient." The financial institution is only injured when the money it lends by covering an account holder's checks—the credit it has extended—is not repaid. But that injury is part of the credit risk a financial institution assumes as its everyday business; when it chooses to guarantee its account holder's overdrawn checks, it becomes an unsecured creditor.[10] NFCU

---

[10] The check guarantee card was a private agreement between the Nevada Federal Credit Union and Goldyn: NFCU agreed to put its own balance sheet behind Goldyn's checks so that merchants would feel comfortable accepting them, and Goldyn agreed to repay NFCU with interest. This is a service that financial institutions offer their customers to make it easier for them to negotiate their checks; presumably they are remunerated for this service, and the risk associated with it, by charging interest and/or collecting fees. NFCU could have conducted a background check on Goldyn, or required collateral from her, before entering into

(continued...)

can try to collect its money from Goldyn using the debt collection procedures it would employ for any other defaulted loan, including a civil lawsuit. Failure to repay a loan, however, is not a crime; the days of imprisoning insolvent debtors are long gone. See, e.g., U.S. Const. amend. XIII (1865); Nev. Const. art. I, § 14 (1864).

In any event, even if the Nevada Supreme Court were correct that the credit union was injured by Goldyn's actions, injury—whether to the payee or the financial institution—is not an element of the crime as established by the statute. See Nev. Rev. Stat. 205.130(1); p. 4 supra. And, if the Nevada Supreme Court intended to interpret the statute as requiring some injury as an element of the crime, this would not satisfy the separate statutory element requiring that defendant lack credit.[11] Thus, we are right back where we started—in need of an

_____

[10](...continued)
such a risky arrangement. The wisdom of its decision to enter into the agreement with Goldyn should be of no concern to the state prosecutor's office or the criminal courts.

[11] In fact, the Nevada Supreme Court in Hoyt v. Hoffman, 416 P.2d 232 (Nev. 1966), held that injury is an element of the crime with which Goldyn was charged. But the injury that the court required was injury to the payee, not to the financial institution. See id. at 233. Indeed, the court held that without injury to the payee, a defendant charged with writing bad checks must be acquitted. See id. ("The legislature did not intend to make it a crime to issue a worthless check absent damage or injury to the payee thereof."). This is yet another reason to grant

(continued...)

explanation for the court's holding that Goldyn lacked the credit to cover her checks.

**4.** The Nevada Supreme Court is, of course, the final arbiter on questions of state law. It has wide latitude in defining and interpreting the elements of Nevada state crimes, and we are precluded on habeas review from reexamining its determinations of state law questions. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). But a state court is not free to define an element out of existence, or to ignore the element entirely when upholding a criminal conviction. Such a ruling is contrary to clearly established federal law, namely Jackson v. Virginia. See 28

---

[11](...continued)
Goldyn's habeas petition: It is undisputed that, as the Nevada Supreme Court itself found, the payees of Goldyn's checks were uninjured. See p. 7 supra. Having previously narrowed the scope of the statute to exclude situations in which the payees are unharmed, the Nevada Supreme Court was not free to expand the scope of the statute during Goldyn's appeal to cover Goldyn's otherwise innocent conduct. Such a retroactive expansion of the scope of a criminal statute violated Goldyn's due process rights. See Marks v. United States, 430 U.S. 188, 191–92, 195 (1977); Bouie v. City of Columbia, 378 U.S. 347, 353–54 (1964) ("Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids. . . . If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.").

U.S.C. § 2254(d)(1).[12]  Indeed, the quintessence of a <u>Jackson</u> claim—the very meaning of <u>In re Winship</u>—is that every element of a crime must be proven beyond a reasonable doubt.

The simple fact is that the checks Goldyn wrote were not bad; they were paid in full pursuant to a contract under which she had bound herself to repay the bank for the monies so advanced.  Goldyn thus had an "an arrangement or understanding with [NFCU] for the payment of [her] check[s]."  Nev. Rev. Stat. 205.130(4).  The Nevada Supreme Court's own finding that NFCU was obligated to pay Goldyn's checks establishes as a matter of law that Goldyn had sufficient "credit"—as defined by the Nevada statute—to cover her checks.[13]  No "rational

---

[12]  For a simple example, consider a state court that is trying a murder case, where the state's definition of murder includes the requirement that the victim be dead.  If there is uncontroverted evidence and a factual finding by the state court that the victim is only badly injured—say, comatose—then the state court cannot uphold the defendant's conviction.  On federal habeas review, we would be compelled to conclude that the evidence was insufficient to support the conviction.  <u>See</u> <u>Jackson</u>, 443 U.S. at 318–19, 323–24.  We would not be forced to accept the state court's decision to interpret "dead" as meaning "badly injured," because such an expansion of the criminal statute would violate the defendant's clearly established federal due process rights.  <u>See</u> 28 U.S.C. § 2254(d)(1).

[13]  It is possible, of course, that NFCU covered Goldyn's purchases with no intention of being repaid.  In common parlance, this would be known as a gift.  Although such a gift would certainly have been generous, we will not presume the credit union intended such generosity absent any evidence to that effect.  In any event, NFCU's decision to cover Goldyn's checks cannot be described as anything

(continued...)

trier of fact could have found" otherwise. See Jackson, 443 U.S. at 319.

Of course, Goldyn might have been prosecuted for defrauding the bank. But the state charged her with writing bad checks, not fraud on the bank. And Goldyn cannot be sent to prison for a crime she didn't commit because she may be guilty of a different crime altogether. "Perhaps some would say that [Goldyn's] innocence is a mere technicality, but that would miss the point. In a society devoted to the rule of law, the difference between violating or not violating a criminal statute cannot be shrugged aside as a minor detail." Dretke v. Haley, 541 U.S. 386, 399–400 (2004) (Kennedy, J., dissenting).

\* \* \*

No check Goldyn wrote that was backed by her check guarantee card—representing the bank's promise to pay Goldyn's checks in full regardless of the funds in her account, and Goldyn's counter-promise to repay the bank—could possibly have been a bad check. Because "there is no factual basis for [Goldyn's] conviction . . . it follows inexorably that [she] has been denied due process of law.

---

[13](...continued)
other than a gift or credit—either it intended for Goldyn to repay the money (in which case it was extending her credit), or it didn't (in which case it was giving her a gift of money). In either case, Goldyn's checks were covered by "money, property or credit" as specified in Nev. Rev. Stat. 205.130(1).

Thompson v. Louisville, 362 U.S. 199 (1960); Jackson v. Virginia, 443 U.S. 307 (1979)." Haley, 541 U.S. at 397 (Stevens, J., dissenting); see also id. at 395 (majority opinion) (citing Winship, 397 U.S. at 364).

We are saddened and dismayed that Goldyn spent twelve years behind bars for conduct that is not a crime—or, at least, is not the crime with which she was charged. We remand to the district court for the immediate entry of a judgment granting the petition and issuing an unconditional writ of habeas corpus vacating Goldyn's conviction.[14]

**REVERSED.**

---

[14] Because we are granting Goldyn's habeas petition for the reasons expressed above, we do not consider her numerous other claims, some of which raise similarly significant issues.

**Counsel**

Franny A. Forsman, Federal Public Defender, and Paul G. Turner, Assistant Federal Public Defender, Las Vegas, Nevada, for petitioner-appellant.

Brian Sandoval, Attorney General; Rene L. Hulse, Senior Deputy Attorney General; and Victor Hugo Schulze II, Deputy Attorney General, Las Vegas, Nevada, for respondent-appellee.