# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KARL ADOLPH FRANTZ,
   *Petitioner-Appellant,*

    v.

HERBERT HAZEY; DORA B. SCHRIRO,
Director,

   *Respondents-Appellees.*

No. 05-16024

D.C. No.
CV-04-00135-WDB

OPINION

Appeal from the United States District Court
for the District of Arizona
William D. Browning, District Judge, Presiding

Argued and Submitted En Banc
March 22, 2007—San Francisco, California

Filed January 22, 2008

Before: Alex Kozinski, Chief Circuit Judge,
Mary M. Schroeder, Harry Pregerson,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Sidney R. Thomas, Barry G. Silverman, Susan P. Graber,
Kim McLane Wardlaw, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Consuelo M. Callahan, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge BERZON,
with whom Chief Circuit Judge KOZINSKI,
and Judges SCHROEDER, PREGERSON, THOMAS,
GRABER, WARDLAW, PAEZ, and BEA join;
Concurrence by Chief Judge Kozinski;
Concurrence by Judge Gould

707

## COUNSEL

Jon M. Sands, Federal Public Defender, for the petitioner-appellant.

Michael L. Burke, Phoenix, Arizona, for the petitioner-appellant.

Paula K. Harms, Phoenix, Arizona, for the petitioner-appellant.

Megan Moriarty, Assistant Federal Public Defender, for the petitioner-appellant.

Terry Goddard, Attorney General, for the respondents-appellees.

Randall M. Howe, Chief Counsel, Criminal Appeals Section, State of Arizona Attorney General's Office, for the respondents-appellees.

**OPINION**

BERZON, Circuit Judge:

Karl Frantz appeals the district court's denial of his petition for a writ of habeas corpus. Invoking the Sixth Amendment right to self-representation and the limits on advisory attorneys' participation described in *McKaskle v. Wiggins*, 465 U.S. 168 (1984), Frantz challenges his exclusion from a chambers conference in which his advisory counsel participated and discussed how the judge should respond to a query from the deliberating jury.[1] The Arizona Court of Appeals denied Frantz's claim on harmless error grounds. Clearly established Supreme Court law holds, however, that a *McKaskle* error is structural and therefore not subject to harmless error analysis. Deciding this appeal first requires that we clarify our approach to reviewing state court decisions that rely on legal principles contradicting clearly established Supreme Court law but do not necessarily reach the wrong result. Having done so, we then proceed to consider the *McKaskle* issue on its constitutional merits.

## I. BACKGROUND

### A.

Karl Frantz was indicted for and later convicted of attempted armed robbery of a McDonald's restaurant in Arizona. At the outset of the judicial proceedings, attorney Paul Bates was appointed to represent Frantz and began to do so. Before trial began, Frantz waived his right to counsel and chose to represent himself. The trial court found Frantz com-

---

[1] We recite here the facts evident from the portions of the state record before us. While we have the transcript of the entire trial through the close of evidence, our record lacks substantial portions of the transcripts from various pre-trial proceedings, off-the-record discussions during the jury's deliberations, and sentencing.

petent to do so but directed Bates to remain involved as "advisory counsel." Later, but still before trial began, attorney Raymond Lamb replaced Bates as advisory counsel.[2]

At trial, Frantz was limited to questioning witnesses from behind the defense table. For reasons not fully explained in the record before us, Frantz was required to wear a leg brace. The limitation on his movement, the state appellate court later explained, minimized the risk of prejudice from the jury's viewing his shackles. Further, "[t]o avoid any appearance that [Frantz] was penalized by representing himself, the prosecutor also examined witnesses and argued her case while seated at the prosecution's table."

Notwithstanding these restrictions, Frantz undertook most of his own defense. He gave a statement to the jury venire; examined and cross-examined all of the witnesses; responded to the state's motions to admit exhibits; stated objections to testimony; and gave a closing argument before the jury. Frantz also participated during trial in one bench conference regarding questions for a witness submitted by the jury, and in two conferences in which the judge and the parties discussed jury instructions out of the presence of the jury.

At the first conference regarding jury instructions, both Lamb and Frantz were present. Lamb told the court that he believed Frantz should ask for instructions to cover the lesser included offense of disorderly conduct. After the judge said he would consider the suggestion, Frantz made a separate request, without any apparent direction or input from Lamb. Beginning, "if I may, one other thing," Frantz asked the court

---

[2]The trial court described Bates's and later Lamb's role as "advisory counsel." *McKaskle*, by contrast, refers to "standby counsel." The two terms may refer to slightly different roles. *See Locks v. Sumner*, 703 F.2d 403, 407 & n.3 (9th Cir. 1983) (suggesting that "standby counsel" is one form of "advisory counsel"). For the purposes of the limitations described in *McKaskle*, however, the two terms are interchangeable, and we use them as such.

also to consider instructing the jury on a separate lesser
included offense: assault. Frantz described why he believed
assault was a lesser included offense and rebutted the state's
argument to the contrary, telling the court that "there is an
abundance of different types of assaults that can take place
[and] some of them don't necessitate . . . any type of weapon
or anything."

After a recess, the judge conferred with the parties once
more regarding the jury instructions. Although Lamb was
present, when the court asked first whether the proposed ver-
dict forms were "agreeable" and, later, whether the parties
wanted to raise other matters related to the instructions, only
Frantz and the state prosecutor answered.

At this latter conference regarding jury instructions, and at
other junctures during trial, Frantz also repeatedly asked the
court to admit as evidence either the tape or the transcript[3] of
the 911 call made from the McDonald's restaurant during the
incident. Frantz argued that the tape or transcript was admissi-
ble to impeach Diana Villalobos, a McDonald's employee
who testified that Frantz approached her, demanded money,
and threatened her with a gun. Although the 911 caller stated
that the intruder had a gun — information that bolstered the
state's case — Frantz maintained that the 911 call also con-
tained impeachment material because a woman on the tape —
whom Frantz contends is Villalobos — identified the robber
as blond, while Frantz describes his hair as brown and gray.[4]

---

[3]Wherever possible, we have noted whether the tape of the call or the
transcript is at issue.

[4]More specifically: During the first day of trial, Frantz told the judge he
hoped to introduce at least part of the 911 tape. After the judge dismissed
the jury for the day, the judge inquired: "Is there anything we need to
cover before tomorrow [when the jury returns] at 11?" Frantz responded,
"The 911 tapes, because I want that entered into evidence about the blond-
haired thing, description." The judge replied, "I'll see you at 11." The trial
transcript shows no further response to the request.

Despite Frantz's active and vocal advocacy, Lamb was not silent during Frantz's two-day trial. Lamb presented needed exhibits to witnesses and also spoke briefly, in Frantz's presence, on a number of issues. He stated, for example, that there were no further questions for potential jurors during voir dire and that there was no objection to admission of certain state exhibits. He verified exhibit labels, cautioned Frantz to slow down his questioning, requested aspirin for Frantz, and counseled Frantz to "shut up" when Frantz identified himself in a photograph shown to a testifying police officer.

Lamb also participated, unaccompanied by Frantz, in a bench conference during voir dire and in seven bench conferences that took place during trial.[5] During voir dire and in the first five of these conferences during trial, the judge requested "counsel" to approach the bench, and Lamb proceeded instead of Frantz. At the conference during voir dire, Lamb stated that he had no follow-up questions for a prospective juror. In one

On the second day of trial, when the issue surfaced again during the conference regarding jury instructions, Frantz responded to the judge's concern that the tape was hearsay by stating that he "want[ed] to use it to impeach the victim due to the fact that she gives totally arbitrary testimony." The judge did not rule on the question, stating that he would "consider [the request] as individual events take place."

Frantz again pursued the issue when he called Villalobos, who had previously testified for the state, as a witness for the defense. After Frantz examined Villalobos about her memory of the intruder's face, Lamb asked in Frantz's presence to admit into evidence the call transcript. A bench conference then began, at which Lamb represented Frantz on the topic.

[5]We use the term "bench conferences" to refer to conferences with the judge that took place while the jurors were present, but presumably out of their earshot.

The bench conferences are distinct from the earlier described conferences in which jury instructions were discussed. During those conferences, the jury was not in the courtroom.

Neither any evidence in the record nor the state court's factual findings clearly explain why Lamb alone attended these conferences.

bench conference during trial, Lamb conceded the prosecutor's objection to a report that Frantz previously stated he wished admitted. In three others, Lamb reviewed questions submitted by the jury for specific witnesses and stated that he had no objection; the record does not show whether Frantz also reviewed the questions or whether Frantz and Lamb discussed them prior to the bench conferences. In the fifth conference during trial, the court reminded Lamb to reserve Frantz's "Rule 20" right,[6] and Lamb advised the court that he was going to try to persuade Frantz not to make an opening statement before the presentation of defense witnesses.[7]

In the final two bench conferences, Lamb argued for the admission of several pieces of evidence: an officer's testimony about what a witness told her, portions of Frantz's bank records, and the tape or transcript of the 911 call. The first such conference began when Frantz asked, "Can we approach?" Lamb approached the bench without Frantz and began the discussion by stating that "Frantz want[ed] [him] to suggest" that the door had been opened for the officer's testimony about what witnesses told her. In the discussion that followed, the judge changed the subject to the 911 tape, which Frantz had previously asked the court to admit. Lamb told the court that Frantz was "fixated" on the question of the robber's hair color. But the judge did not rule on the admissibility of the tape; he simply upheld the objection to the officer's testimony.

The last bench conference began after Lamb told the court in Frantz's presence, "We have some proposed exhibits." Lamb and the prosecutor approached the bench and discussed

---

[6]Arizona Rule of Criminal Procedure 20 allows defendants to make motions for a judgment of acquittal.

[7]A few seconds later, Lamb reported back that he had successfully persuaded Frantz not to make the statement. Shortly thereafter, Frantz followed up on the Rule 20 discussion, moving on his own behalf for a judgment of acquittal.

admission of the bank records and the transcript of the 911 call. The judge ruled admissible a portion of the bank records and suggested that, with the proper foundation, he would allow into evidence at least portions of the 911 call transcript, either under an exception to the hearsay rule or as admissible non-hearsay. Lamb stated, however, that he would advise Frantz that the bank records "should suffice, that that is [sic] — that will give him better grounds to argue [the call transcript], and maybe we can dispense with that." The judge never explicitly ruled on the 911 call transcript. Shortly after Lamb asked "for a minute to talk to [his] client" and the court ruled on the bank records, Frantz withdrew his request for the transcript.

Neither the 911 tape nor the transcript of the call was thus ever presented to the jury at trial. But, critically for this appeal, the question of the tape arose again, and Lamb, alone, addressed the question before the court.

While deliberating, the jury submitted questions related to the tape of the 911 call and to a statement from a "manager," presumably of the McDonald's restaurant. The judge addressed the two questions in a chambers conference attended by Lamb and the prosecutor, but not Frantz.

As we explain in more detail below, nothing in the record explains the circumstances of Frantz's exclusion from the chambers conference, but the record does explain what happened at the conference: The state agreed to release the tape "if that's what the defendant wants to do." Lamb rejected the state's offer, replying, "He doesn't want it," and stating that the answer to the jurors' question "will be as [the judge] originally framed it." Responding "okay" to Lamb's statement, the court denied the jury's request, and later instructed the jurors that they should simply rely on their recollection of the evidence admitted during trial.

Frantz was convicted and sentenced to a 135-month prison term.

**B.**

Upon affirmance of his conviction and sentence on direct appeal, Frantz filed a petition for post-conviction relief pursuant to Arizona Rule of Criminal Procedure 32. Among other claims, he contended that his exclusion from the chambers conference regarding the jury's inquiries during deliberations violated his Fifth, Sixth, and Fourteenth Amendment rights. In support of that proposition, he cited *McKaskle*, which establishes limitations on standby counsel's assistance to a criminal defendant who has exercised his Sixth Amendment right to self-representation. Frantz argued that he should have been able to discuss the jury's request with the judge himself. He claimed that Lamb either inaccurately communicated with him about the jury's request or failed to communicate with him at all. Specifically, Frantz's petition stated that "advisory counsel told Defendant that *part* of [the] 911 transcript was wanted, but only the part the State wanted to further prove guilt of Defendant and not *all* [the] 911 tape as requested by the jury." The declaration that Frantz submitted with the petition worded the allegation differently: that "[o]n the final day of trial . . . advisory counsel, Ray Lamb, did not tell [him] the jury wanted to hear [the] 911 tapes, nor to have them played to the jury."

The state trial court rejected Frantz's contentions without holding a hearing on them. In particular, the trial court accepted the averment in the state's response brief that, as the court summarized, "[w]hen the question was presented to the Petitioner [sic] was in a holding cell and was not present in the courtroom. Advisory counsel consulted with the Petitioner and advised the court that the Petitioner did not wish the tape to be played." The state's brief had so asserted, but included no evidence proving the allegation.[8] The state Court of

---

[8]The state's brief simply stated: "[A]s the Court will recall, during deliberations when the jury questions came in, advisory counsel went to the holding cell in Superior Court and discussed the questions with the defendant. After the question was discussed, advisory counsel reported the defendant's position to the State and the Court in chambers."

Appeals rejected the trial court's factual finding, noting that Frantz had submitted a contrary allegation under oath and that, under state law, the trial court was therefore obliged for purposes of summary determination to assume that Frantz's allegation was true. Nevertheless, the Court of Appeals held, Frantz's exclusion from the chambers conference did not merit relief.

The appellate court did not address whether Frantz's exclusion from the conference was unconstitutional under *McKaskle*. Rather, it denied relief because it concluded that any error did not prejudice Frantz. "[W]e fail to see how [playing the tape to the jury] would have changed the verdict," the court held. "Petitioner's argument focuses on the fact that the 911 caller described the suspect as having blond hair, whereas he claims he has brown and gray hair. But petitioner did not pursue a misidentification defense at trial."

Upon denial of all his claims for relief, Frantz petitioned for further review by the Arizona Supreme Court. After the state Supreme Court denied review, Frantz filed the federal habeas petition that resulted in this appeal, challenging, inter alia, his exclusion from the chambers conference. The district court denied relief but granted a certificate of appealability (COA) with regard to that claim and two others.[9]

---

[9]The COA also covers Frantz's claims that he was improperly denied access to a law library and that his appointed counsel, Bates, was ineffective during plea negotiations when he failed to investigate the state's allegation that Frantz committed the offense while on probation for a Florida offense. We deny both these claims in a memorandum disposition filed simultaneously with this opinion.

In addition to several other claims, the COA did not cover a claim closely related to the one we discuss here. On direct appeal, Frantz challenged his exclusion from bench conferences during trial. The state court concluded that the claim was best raised in state post-conviction relief proceedings, in which Frantz could develop a record. Frantz did not raise the issue again in his petition for post-conviction relief in state court. On habeas review, the district court concluded that the claim was not properly raised because "Petitioner failed to clearly state the federal law bases for his claim and he failed to follow the [state] appeals court's instruction to develop a record on the issue in post-conviction proceedings."

We address only Frantz's exclusion from the chambers conference.[10] Based on the uncontested record evidence, we conclude that Frantz's Sixth Amendment rights could have been violated by his exclusion from the conference. But we remand for an evidentiary hearing on several critical questions unanswered by the record before us. Before we analyze the merits of Frantz's *McKaskle* claim, however, we clarify the scope of our review of the Arizona Court of Appeals' decision.

## II.    AEDPA ERROR AND SCOPE OF REVIEW

Here is the dilemma we face: The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19, provides that, if a claim was adjudicated on the merits in state court proceedings, then

> [a]n application for a writ of habeas corpus . . . shall not be granted . . . unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[10]In doing so, we must accept any state court factual findings as true, absent any evidence to the contrary. 28 U.S.C. § 2254(e). Unlike the Judge Gould's concurrence, Gould concurrence at 753-54, we do not consider the federal district court's statements that Frantz "was not in the courtroom but in a holding cell" at the time of the conference and that "[a]dvisory counsel consulted with [Frantz]" regarding the conference. The finding is clearly erroneous on the present record. The state trial court's findings to this effect were vacated by the state Court of Appeals and thus merit no deference. *See Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006). Furthermore, as explained earlier, the record includes only an unsupported averment to this effect. The sole evidence submitted in state or federal court regarding this matter is Frantz's affidavit, which contradicts the district court's statement.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As we develop later, the state appellate court's decision in this case was on the merits, but was "contrary to . . . clearly established Federal law, as determined by the Supreme Court" because it applied an improper rule in determining that any constitutional error was not prejudicial. But the state Court of Appeal never addressed whether there was constitutional error in excluding Frantz from the conference regarding the jury's requests.

Our case law concerning the appropriate approach under AEDPA cases like this one, in which the state court decision satisfies the § 2254(d)(1)[11] standard for the grant of habeas corpus relief but leaves a dispositive constitutional issue undecided, is murky.[12]

---

[11]Unless otherwise stated, all statutory citations in this opinion are to sections of 28 U.S.C.

[12]We have not, for example, always reviewed a state court's choice of legal standards under the "contrary to" prong of § 2254(d)(1), as we do today. Some of our earlier cases have suggested that the choice of an appropriate legal standard is unreviewable because it constitutes a court's "reasoning," *see, e.g.*, *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002), or that such a choice is reviewable only under the "unreasonableness" prong of § 2254(d)(1), *see, e.g.*, *Williams v. Warden*, 422 F.3d 1006, 1010 (9th Cir. 2005), *cert. denied*, 547 U.S. 1003 (2006).

We have also not consistently stated whether identification of a § 2254(d)(1) error is alone sufficient to warrant habeas relief. One line of cases, exemplified by *Cooper-Smith v. Palmateer*, 397 F.3d 1236 (9th Cir.), *cert. denied*, 546 U.S. 944 (2005), has held that a state court's choice of the wrong legal standard — or some other § 2254(d)(1) error — does not alone justify habeas relief, and that further review of a petitioner's claim is necessary to grant a writ of habeas corpus. *See, e.g.*, *id.* at 1243; *see also Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005) (collecting cases), *cert. denied,* 547 U.S. 1059 (2006). In conflict with our

With the aid of recent Supreme Court decisions, we begin by delineating the proper approach to federal habeas in such circumstances, with a focus on two questions: (1) Does a state court's use of the wrong legal standard meet the § 2254(d)(1) criteria even if the state court's ultimate conclusion that the conviction was constitutional may have been correct for a different reason? And (2) if so, what manner of constitutional review should follow our identification of this § 2254(d)(1) error? In section III, we return to the merits of Frantz's *McKaskle* claim.

## A.

**[1]** We have recognized a "latent confusion in our case law concerning whether, under [§ 2254(d)(1)], it is necessary or permissible for us to review the 'reasoning' used by the state court, or whether we are simply to review the 'decision' of that court adjudicating the merits of the petitioner's claim." *Sims v. Rowland*, 414 F.3d 1148, 1152 n.2 (9th Cir.), *cert. denied*, 546 U.S. 1066 (2005). It is now firmly established, however, that "a decision by a state court is 'contrary to' [the] clearly established law [of the Supreme Court] if it '*applies a rule* that contradicts the governing law set forth in [Supreme Court] cases.' " *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)) (emphasis added); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) ("Avoiding [a 'contrary to' error] does not require citation . . . [or] *awareness* of [Supreme Court] cases, so long as neither the *reasoning* nor the result of the state-court decision contradicts them." (second emphasis added)); *cf. Panetti v. Quarterman*, 127 S. Ct. 2842, 2855-58

holding today, another line of cases has suggested — if not explicitly decided — that a § 2254(d)(1) error alone is sufficient to merit relief, even when that error does not necessarily resolve the constitutionality or legality of a prisoner's confinement. *See, e.g.*, *Kaua v. Frank*, 436 F.3d 1057, 1062 (9th Cir. 2006), *cert. denied,* 127 S.Ct. 1233 (2007); *Van Lynn v. Farmon*, 347 F.3d 735, 741 (9th Cir. 2003).

(2007) (finding a § 2254(d)(1) error under the "unreasonable" prong because the state court unreasonably applied the Supreme Court's procedural standards for considering such claims). In other words, mistakes in reasoning or in predicate decisions of the type in question here — use of the wrong legal rule or framework — do constitute error under the "contrary to" prong of § 2254(d)(1).

Indeed, except in the extremely rare circumstance in which a state case presents facts that are materially identical to those in a Supreme Court case, it is difficult to imagine many situations in which the *result* of a state court adjudication could be contrary to clearly established Supreme Court precedent. In this case, for example, asking whether the state court's ultimate denial of Frantz's *McKaskle* claim was "contrary to" established Supreme Court law is pointless, because Supreme Court law dictates only the intermediate steps of analysis. Consequently, the "decision" referred to in § 2254(d)(1) necessarily encompasses the conclusions of law on which the ultimate result in state court was based. *See Williams*, 529 U.S. at 412-13 ("Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a *question of law* . . . ." (emphasis added)).

**[2]** With this guiding principle in mind, we return to the state court error in this case. By inquiring into prejudicial effect, the Arizona Court of Appeals conducted harmless error review of Frantz's *McKaskle* claim. But, contrary to the state court's assumption, Supreme Court case law establishes unequivocally that a violation of the right to self-representation recognized in *Faretta v. California*, 422 U.S. 806 (1975), is structural and thus is not susceptible to harmless error review.[13] *See McKaskle*, 465 U.S. at 177 n.8 ("Since

---

[13]Harmless error review of constitutional "trial errors" in the context of habeas petitions differs from harmless error review on direct appeal. *See generally Fry v. Pliler*, 127 S. Ct. 2321 (2007). Where an error is struc-

the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis."); *see generally United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2564 (2006) (surveying constitutional errors characterized as structural and not subject to harmless error analysis). Because the Arizona Court of Appeals "applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases," *Price*, 538 U.S. at 640 (internal quotation marks omitted), the § 2254(d)(1) standard for the grant of habeas relief is satisfied.

## B.

Having so concluded, what do we do next? Do we simply grant habeas relief? Or do we decide the constitutional issue that the state Court of Appeals did not decide: whether the exclusion of Frantz from the mid-jury-deliberations conference was unconstitutional under *McKaskle*?

**[3]** As we noted at the outset, our own cases are somewhat unclear on that point. The Supreme Court, however, has recently clarified our responsibility once we have found a state court error that satisfies § 2254(d)(1): When "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the

---

tural, however, it is not subject to harmless error review of any kind on direct appeal, *see Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991), and harmless error review also is not appropriate in habeas proceedings. *See Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993) (importing *Fulminante*'s distinction between trial errors and structural errors into the habeas context); *Gibson v. Ortiz*, 387 F.3d 812, 820 (9th Cir. 2004) (applying direct appeal definition of structural error to habeas review); *Martinez v. Garcia*, 379 F.3d 1034, 1039 (9th Cir. 2004) (similar); *see also Mitchell v. Esparza*, 540 U.S. 12, 15-17 (2003) (per curiam) (on habeas review, consulting direct appeal cases to determine whether an error was clearly established as "structural" or not).

deference AEDPA otherwise requires." *Panetti*, 127 S. Ct. at 2858; *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing the prejudice requirement for an ineffective assistance of counsel claim de novo after identifying a § 2254(d)(1) error in the state court's evaluation of the performance requirement); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (similar); *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (holding that even if the state court's decision was contrary to Supreme Court case law, "that error would justify overturning Penry's sentence only if Penry could establish that the error" was prejudicial under the pre-AEDPA standard for evaluating prejudice); *Williams*, 529 U.S. at 406 (explaining that when a federal habeas court identifies a "contrary to" error, it "will be unconstrained by § 2254(d)(1)"). So it is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.

The Supreme Court has not fully explained, however, why that is true. We do so now, briefly, as the underlying reasoning may prove useful to habeas courts applying these principles.

As the Eleventh Circuit has explained, "Section 2254 presumes that federal courts already have the authority to issue the writ of habeas corpus to a state prisoner . . . . [I]t is not itself a grant of habeas authority, let alone a discrete and independent source of post-conviction relief." *Medberry v. Crosby*, 351 F.3d 1049, 1059-60 (11th Cir. 2003); *see also id.* at 1056-58 (explaining the evolution of § 2254). Instead, it is § 2241 that provides generally for the granting of writs of habeas corpus by federal courts, implementing "the general grant of habeas authority provided by the Constitution." *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir.), *cert. denied,* 543 U.S. 991 (2004). In turn, § 2254(d), like other subsections of § 2254, implements and limits the authority granted in § 2241 for "a person in custody pursuant to the judgment of a State

court." § 2254(a). *See White*, 370 F.3d at 1008 ("[Section] 2254 is properly seen as a limitation on the general grant of habeas authority in § 2241."); *see also Felker v. Turpin*, 518 U.S. 651, 662 (1996) ("Our authority to grant habeas relief to state prisoners is limited by § 2254 . . . ."). Just as, for example, § 2254(b) restricts our underlying § 2241 and constitutional authority by creating an exhaustion requirement, § 2254(d) establishes certain kinds of state court error as a predicate to habeas relief "with respect to any claim that was adjudicated on the merits in State court."

Where, as here, the limitations established by other subsections of § 2254 are satisfied, § 2254(a) sets out the general standard that must be satisfied by a petition "for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court": The petition must rely "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *See also* § 2241(c) (extending federal courts' general habeas authority not only to prisoners in custody in violation of the Constitution or federal laws but also to several other groups of prisoners).[14] It is that

---

[14]Section 2241(c) reads:

The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

more general — but still limited — provision that alone governs, where the other limitations set out in § 2254(d) (and in § 2244) are no obstacle to the grant of habeas relief. Further, the text of both § 2254(a) and § 2241(c) refers only to the substantive invalidity of the confinement under the Constitution and contains no requirement of deference to state court adjudications. Federal courts governed only by those sections, therefore, necessarily decide the issues before them de novo, as was done before AEDPA's addition of § 2254(d) in 1996. *See Gratzer v. Mahoney*, 397 F.3d 686, 689-90 (9th Cir.); *Chizen v. Hunter*, 809 F.2d 560, 561 (9th Cir. 1986); *cf. Fry*, 127 S. Ct. at 2327 (in the context of harmless error review, concluding that when a state court has made a § 2254(d)(1) error, the pre-AEDPA habeas review standard is appropriate for a question that the state court did not reach).

We caution that this analysis does not dictate either a two-stage process or any particular order of decision. For one thing, a holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the § 2254(a)/§ 2241 requirement is satisfied as well, so no second inquiry will be necessary. *See, e.g.*, *Goldyn v. Hayes*, 444 F.3d 1062, 1070-71 (9th Cir. 2006) (finding § 2254(d)(1) error in the state court's erroneous conclusion that the state had proved all elements of the crime); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) error in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge). In this case, however, the Arizona court's § 2254(d)(1) error — inappropriate use of harmless error review — does not tell us whether Frantz's conviction and custody were unconstitutional. Whether it was depends on whether *McKaskle* error occurred when Frantz, although representing himself, was excluded from the chambers conference on the jury's inquiry during deliberations. If no such error occurred then, quite obviously, the state Court of Appeal's bottom line was right — the conviction was not infected by constitutional error and should not have been

reversed. In that event, we may not grant habeas relief under §§ 2241 and 2254(a).

Moreover, "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1)." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Nor does it require any particular methodology for ordering the § 2254(d) and § 2254(a) determination. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1061 (9th Cir. 2005). Sometimes, we may be able to decide the § 2254(d)(1) issue better by deciding the constitutional issue de novo first, when doing so would illuminate the § 2254(d)(1) analysis. *See, e.g.*, *Weeks v. Angelone*, 528 U.S. 225 (2000). In other cases, it may make sense to address § 2254(d)(1) first. *See, e.g.*, *Panetti*, 127 S. Ct. at 2858.

**[4]** In sum, where the analysis on federal habeas, in whatever order conducted, results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review the substantive constitutionality of the state custody de novo.

## C.

Having established the appropriate mode of review once the § 2254(d)(1) standard is met, we address one additional point: Respondents suggest that, even upon de novo review, we should consider only rationales supporting the state court conviction that "were . . . within the contemplation of the state court." We generally agree, with some caveats.

Representative of the issue that Respondents raise is *Van Lynn*, a case in which the state court had erroneously denied a defendant's motion for self-representation by applying the wrong standard to evaluate the defendant's competence for such representation. 347 F.3d at 741. The respondent argued that, although the state court had erroneously deemed the defendant incompetent, habeas relief was inappropriate

because the court could have denied the motion on the alternative ground that it was untimely. *Id.* Reviewing the state's arguments, we concluded that we could not "invent an alternative rationale for the state court's decision which requires application of an entirely different *and unrelated* legal principle . . . and then . . . review the trial court's decision as if it had been made pursuant to that alternative rationale." *Id.* (emphasis added).

**[5]** When we are reviewing a state court decision to decide whether there is a § 2254(d)(1) error, the conclusion that we reached in *Van Lynn* is undoubtedly correct. We confine our § 2254(d)(1) analysis to the state court's *actual* decisions and analysis. The text of § 2254(d)(1) demands this approach, by pointing us to the "decision[s]" that result from state courts' "adjudication of . . . claim[s]" and the "application[s] of . . . law" that were "involved" in such decisions. Consistent with the statutory text, the Supreme Court has twice cautioned federal courts to read state court decisions carefully to determine the rule that *actually* governed the state court's analysis. *Holland v. Jackson*, 542 U.S. 649, 654-55 (2004) (per curiam); *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (per curiam).[15]

Indeed, if we were to defer to some *hypothetical* alternative rationale when the state court's *actual* reasoning evidences a § 2254(d)(1) error, we would distort the purpose of AEDPA.

---

[15]In the related context of "unreasonable application" errors, too, the Supreme Court has focused its analysis on state courts' actual reasoning rather than hypothetical alternative lines of analysis. *See Holland*, 542 U.S. at 652 ("The Sixth Circuit erred in finding the state court's application of [federal law] unreasonable on the basis of evidence not properly before the state court."); *Wiggins*, 539 U.S. at 528-29 (holding unreasonable a state court's conclusion that an attorney's performance was sufficient because the attorney's investigation was too narrow, without considering separate justifications based on alternative readings of the record); *see also Oswald v. Bertrand*, 374 F.3d 475, 483 (7th Cir. 2004) ("A state court can of course be wrong without being unreasonable, and the reasonableness of a decision ordinarily cannot be assessed without considering the quality of the court's reasoning . . . .").

AEDPA "plainly sought to ensure a level of 'deference to the determinations of state courts.' " *Williams*, 529 U.S. at 386 (Stevens, J., concurring) (quoting H.R. Conf. Rep. No. 104-518, at 111 (1996)). Applying § 2254(d)(1) to a state court's *actual* analysis accords such deference. But applying the deferential standards in § 2254(d)(1) to evaluate analysis a state court did not conduct is inconsistent with AEDPA deference. Such an approach would require us to ignore rather than respect the state court's analysis, and it would effectively require us to defer to states in their role as respondents in habeas actions rather than as independent adjudicators. Such a presumption in favor of a state party is distinct in both purpose and effect from respect afforded to state courts.

Our approach is not quite so straightforward, however, when we are reviewing legal questions without AEDPA deference. Unlike § 2254(d)(1) analysis, § 2254(a) review will often require consideration of legal arguments not addressed by the state court in its opinion. In this case, for example, we must consider the *McKaskle* question that the state court avoided and, in doing so, we consider the "alternative rationale" advanced by the respondents for affirming the Arizona court's decision.

Nevertheless, even on § 2241 de novo review, we would reject an alternative and unrelated legal argument of the type advanced by the respondent in *Van Lynn*. As with any de novo review, our § 2241 review is confined to the alleged wrong and the actual course of events at trial and on appeal. We cannot invent a constitutional sequence of events to justify that which simply did not happen. *Cf. Hirschfield v. Payne*, 420 F.3d 922, 928-29 (9th Cir. 2005) (holding that the federal court could not consider under § 2254(d)(1) a rationale offered by the state for the trial court's denial of the petitioner's motion for self-representation when that rationale would have constituted a discretionary denial of the motion). Moreover, when the constitutional right itself is tied to the reasons for a trial court's decision, *see, e.g.*, *Van Lynn*, 347

F.3d at 740 (discussing the Supreme Court's guidance on the reasons why a trial court can deny a criminal defendant's motion for self representation), even on de novo review we must focus on the trial court's reasoning to determine whether a constitutional violation occurred.

We need not elaborate further today on the precise line between those undecided issues that we will address on de novo consideration of constitutional issues and those that we will not. Here, the undecided issue was the logical predicate to the one that was decided in the state Court of Appeals, and was decided, albeit on a procedurally improper factual basis, by the state trial court. And the U.S. Supreme Court has repeatedly considered such inherently linked issues de novo on habeas once the § 2254(d)(1) requirement is met.

**[6]** In sum, then, we hold the following: To identify a § 2254(d)(1) "contrary to" error, we analyze the court's actual reasoning, to the extent that the Supreme Court has dictated how a state court's reasoning should proceed. Identification of such an error is not the end of a federal habeas court's analysis, however, unless that identification necessarily means that the state court's determination of the ultimate constitutional or legal question is also wrong. Instead, pursuant to § 2254(a) and pre-AEDPA standards of review, we must also evaluate de novo the petitioner's constitutional claims, without limiting ourselves to the reasoning of the state court.

### III.  *McKaskle* ERROR

Because we have identified a § 2254(d)(1) error in the Arizona state court's opinion, we review de novo Frantz's Sixth Amendment claim regarding his exclusion from the chambers conference.

### A.

**[7]** *Faretta* established a criminal defendant's right to represent himself, "provided only that he knowingly and intelli-

gently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol." *McKaskle*, 465 U.S. at 173. But *Faretta* did not recognize an unqualified right for *pro se* defendants to stand alone in a courtroom. Instead, the Supreme Court allowed states to appoint "standby counsel" to aid *pro se* defendants "if and when [they] request[ ] help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta*, 422 U.S. at 834 n.46.

**[8]** In *McKaskle*, the Supreme Court reiterated *Faretta*'s holding concerning standby counsel and indicated that rather than creating an "absolute bar on standby counsel's unsolicited participation," 465 U.S. at 176, *Faretta* allows standby counsel sometimes to participate without violating an individual's right to self-representation. *Id.* at 177. But to clarify the distinction between permissible and impermissible interference by standby counsel, *McKaskle* "impose[d] some limits on the extent of standby counsel's unsolicited participation," *id.* at 177, so as to protect the *Faretta* right.

**[9]** Those limitations are, first, that "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury," and, second, that "participation of standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id.* at 178. Because the conference that Frantz challenges took place out of sight of the jury, we are concerned today with the first, but not the second, of *McKaskle*'s two core limitations.

**[10]** *McKaskle* offers considerable guidance as to when a standby attorney's participation so reduces a defendant's control as to violate *Faretta*. On the one hand, "[i]f standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions . . . or to speak *instead* of the defen-

dant on any matter of importance, the *Faretta* right is eroded." *Id.* at 178 (emphasis in original). On the other hand, standby counsel may assist in two ways: (1) "in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete," *id.* at 183; and (2) by "help[ing] to ensure the defendant's compliance with basic rules of courtroom protocol and procedure." *Id.*

Applying this guidance, we conclude that Lamb's solo participation in the chambers conference may well have violated Frantz's right to self-representation, but that we need some further development of the record before we can decide the ultimate constitutional question. We first hold that, even if Lamb accurately portrayed Frantz's wishes, unconsented-to exclusion from the conference would so substantially reduce Frantz's ability to shape and communicate his own defense as to violate his *Faretta* rights. Having so concluded, we then consider whether we can determine from the present record that Frantz did not accede to Lamb's participation, or whether instead we must remand for an evidentiary hearing on the question.

## B.

**[11]** The chambers conference involved two questions relevant to this case: (1) whether the jury, at its own request, should be allowed to hear the 911 tape; and (2) if the tape was not admitted, how the judge should respond to the jury's request.[16] Neither question fell within *McKaskle*'s categorical

---

[16]The transcript in our record of the conference reads:

THE COURT: Let's go on the record.

Show the presence of counsel but not the defendant.

We received jury questions No. 1 and 2. I understand there were no managers' statements taken; is that correct?

exceptions to *Faretta* protection. Certainly, neither involved the basic procedural issues contemplated by *McKaskle* as appropriate for intercession by standby counsel. *See* 465 U.S. at 184 (excusing standby counsel's participation in matters of "basic mechanics" such as "informing the court of the where-abouts of witnesses, supplying [the defendant] with a form needed to elect to go to the jury at the punishment phase of

---

MS. GARCIA [for the state]: Yeah.

MR. LAMB: That's correct.

THE COURT: And I further agree that — further understand that the State would agree to play the 911 tape to the jury; is that correct?

MS. GARCIA: Yeah, if that's what the defendant wants to do.

MR. LAMB: He doesn't want it.

THE COURT: Okay.

MR. LAMB: The question will be as you originally — the answer will be as you originally framed it.

THE COURT: What we might do is clarify that — my proposed answer was, The 911 tape was not, nor was any manager's statement, admitted into evidence. Please refer to my instructions.

What we might do to clarify this and state: The 911 tape was not admitted into evidence and no manager's statement was ever taken.

MS. GARCIA: That's fine, or —

MR. LAMB: Well, I'm sure somebody must have talked to the manager.

[discussion follows between Lamb and Garcia] . . .

THE COURT: I could simply say, You must rely on your collective recollection of the facts and the exhibits already admitted into evidence.

MR. LAMB: That's fine.

THE COURT: Okay. What I have written here is: "You must rely on your collective recollection of the testimony and the exhibits admitted into evidence. Please refer to my instructions."

MR. LAMB: Fine, Judge.

THE COURT: Okay. That's fine.

trial, explaining to [the defendant] that he should not argue his case while questioning a witness"). And both questions discussed at the chambers conference involved far more than "routine . . . obstacles to the completion of some specific task . . . that the defendant ha[d] clearly shown he wishe[d] to complete." *Id.* at 183. Both the substance of the jury's request — for evidence not admitted at trial — and the judge's apparent willingness to consider granting it were highly unusual.[17] Moreover, Frantz had not earlier established his position on the jury's inquiry, as the request had just then been made. The upshot is that Lamb's participation was entirely distinct from that of the standby attorney in *McKaskle*, who — with the Supreme Court's approbation — questioned a witness to establish "an appropriate predicate" only after the defendant sought in open court to introduce the very evidence himself and encountered difficulty because of the lack of such predicate. *Id*. at 184.

[12] As neither of the roles for standby counsel recognized in *McKaskle* pertains, we must turn to the more general standard enunciated in *McKaskle*: Was the in-chambers proceeding in which Frantz did not participate one involving "any significant tactical decisions" or "any matter of importance"? *Id.* at 178. We hold that it involved both and that, therefore, Frantz had to be allowed to make the tactical decisions involved and to speak for himself about them, unless he consented to Lamb's doing so instead.

In considering these issues, we are aware of the Tenth Circuit's observation that *McKaskle* "seems to stop short of a per se rule when it states that [standby counsel's interference in

---

[17]The court's request for input and the state's acquiescence in providing the tape indicate that the judge was willing to consider granting the jurors' request. *See supra* note 16 (transcript of proceeding). At oral argument before the en banc court, the respondents' counsel stated that under state law the tape could have been presented to the jurors on their request even though it had not been introduced at trial.

such matters] only 'erode[s]' *Faretta* rights. 'Erode' is not a synonym for 'violate.' " *United States v. McDermott*, 64 F.3d 1448, 1454 (10th Cir. 1995). In some cases, it may be that standby counsel can "erode" *Faretta* rights without violating them.

This case, however, is not a borderline one of that kind. The chambers conference involved two issues with undoubted tactical importance. Particularly because the conference involved discussions that Lamb and Frantz could not have accurately predicted or rehearsed in advance, Frantz's exclusion resulted in a complete silencing of Frantz's voice on the matters.

We take the two matters discussed at the in-chambers conference in turn:

(1)    *Whether the jurors should be allowed to hear the 911 tape*

**[13]** The jurors' request raised an issue that we have often found quintessentially strategic: the choice of whether to admit evidence that could either help or harm a defendant's case. *See generally Darden v. Wainwright*, 477 U.S. 168, 186 (1986); *Boyde v. Brown*, 404 F.3d 1159, 1174 (9th Cir.), *amended by* 421 F.3d 1154 (9th Cir. 2005); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). Whether the jurors should have been allowed to hear the 911 tape is no exception.

Throughout the trial, Frantz indicated that he thought the requested tape had particular significance to his defense. Despite the damaging statement on the tape that the robber was armed, Frantz believed that the tape could impeach the credibility of the government's most knowledgeable witness, Diana Villalobos. Villalobos, the cashier whom Frantz allegedly approached to rob, was the sole witness who described the entire sequence of the robbery. She was also the only wit-

ness to testify that she saw Frantz with a gun; the police officers who responded to the scene did not report seeing Frantz with a gun and never recovered one. Accordingly, during his two-day trial, Frantz three times tried to introduce the tape or its transcript, and Lamb told the judge during one bench conference that Frantz was "fixated" on the issue.

After the judge suggested to Lamb that he would grant Frantz's request to admit the transcript of the 911 call, Frantz withdrew the request; the record before us does not explain why. Still, Frantz's change of position does not diminish the importance of any decision about the call tape or transcript. Admitted or not, the content of the 911 call — on tape or as transcribed — maintained its potential strategic relevance, as the very request from the jury to hear the tape indicated.[18]

[14] As a result, we conclude that, to the extent that the chambers conference involved a decision about whether to admit the 911 tape, participation in it was central to Frantz's *Faretta* right to control his defense. *See generally McDermott*, 64 F.3d at 1454 (holding that a defendant's *Faretta* rights were violated by his exclusion from bench conferences addressing issues including admissibility of testimony and other evidence); *Oses v. Massachusetts*, 961 F.2d 985, 986 (1st Cir. 1992) (per curiam) (holding that a defendant's *Faretta* rights were violated by his exclusion from bench conferences covering "important issues" including "the admission of evidence").

---

[18]The respondents urge us to consider the proceeding unimportant because the 911 tape could not have helped Frantz's defense. Whether or not the tape could actually have affected the jury's decision is irrelevant to the question we confront here. As *McKaskle* recognizes, the "core of the *Faretta* right" is the defendant's "actual control over the case he chooses to present to the jury." 465 U.S. at 178. Our primary concern is which choices were important to Frantz's conception of his strategy, not whether those choices were smart or necessary.

(2)	*How the reply to the jury's request should be worded*

**[15]** Independently of our concern regarding the decision about the tape, we also hold that the conference triggered Frantz's *Faretta* rights because it resolved the content of the judge's response to the jurors' request. The chance to shape the jury's interpretation of an important tactical decision is at least as important as the chance to make the decision itself. And regardless of the judge's leeway in granting the jurors' request, the substance and wording of the judge's response could have influenced the jurors' interpretation of the tape's absence.

We have repeatedly recognized how seriously jurors consider judges' responses to their questions. In federal court, we allow trial judges substantial latitude in addressing jury questions. But we know that "analytically correct" answers to a jury may unnecessarily — and improperly — influence a jury. *See Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003); *see also id.* at 994-98 (discussing cases). Furthermore, even if not improper, we recognize that *some* influence on the jury's deliberations is difficult to avoid when the jury is troubled enough to seek advice. "The influence of the trial judge on the jury is necessarily and properly of great weight . . . . Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Bollenbach v. United States*, 326 U.S. 607, 612 (1946) (internal quotation marks and citations omitted); *cf. United States v. Sacco*, 869 F.2d 499, 501-02 (9th Cir. 1989) (recognizing that a careful response to a jury's request for specific pieces of evidence can keep the jury from overvaluing any one piece of evidence); *United States v. Frazin*, 780 F.2d 1461, 1469 (9th Cir. 1986) (recognizing that "[a] defendant's participation in formulating a response to a deadlocked jury . . . may be important to ensuring the fairness of the verdict," particularly because there may be hold-out jurors).

Because of the delicate nature of such mid-deliberation inquiries, we have recognized that defendants or their attorneys have a due process right to be present in conferences when jurors' notes are discussed, *United States v. Barragan-Devis*, 133 F.3d 1287, 1289 (9th Cir. 1998), or "when a trial court prepares a supplemental instruction to be read to a deliberating jury," *United States v. Rosales-Rodriguez*, 289 F.3d 1106, 1110 (9th Cir. 2002). Presence is critical when a jury's questions are discussed because "[c]ounsel might object to the instruction or may suggest an alternative manner of stating the message," *id.* at 1110 — a critical opportunity given the great weight that jurors give a judge's words. The defendant's or attorney's presence may also be an important opportunity "to try and persuade the judge *to* respond." *Barragan-Devis*, 133 F.3d at 1289.[19]

In this case, the transcript shows that the judge chose between two instructions. He first proposed the following response: "The 911 tape was not admitted into evidence and no manager's statement was ever taken." He discarded this initial proposal, however, after Lamb objected that it was not clear that "no manager's statement was ever taken." Instead, the judge instructed jurors much more generally — that they "must rely on [their] collective recollection of the testimony and the exhibits admitted into evidence."

It is difficult to discern how the difference between the initial proposed instruction and the judge's actual instruction to jurors might have affected them differently. But the two responses were quite different, and Frantz, because he was not present, had no opportunity to make any strategic decision concerning them, or to develop on the spot an alternative proposal once the judge changed his mind about his original, pro-

---

[19]Although the *McKaskle* standards do not exactly mirror the "right to be present" due process jurisprudence, the *McKaskle* standards do draw upon the presence jurisprudence. *McKaskle*, 465 U.S. at 178.

posed wording. That opportunity to strategize and to speak for himself is a *Faretta* right protected by *McKaskle*.

## C.

Respondents argue that despite the conference's importance, Frantz's exclusion was constitutional because Lamb consulted Frantz and accurately repeated Frantz's desire not to give the jury the 911 tape. But for reasons we explain below, faithfully repeating Frantz's opinion is not sufficient under *McKaskle*, unless Frantz consented to have Lamb speak for him at the conference.

[16] Absent consent by Frantz for Lamb to participate in his stead, whether or not Lamb accurately relayed Frantz's position on the tape is not dispositive of Frantz's claim. *See generally McDermott*, 64 F.3d at 1453-54 (holding that a defendant's rights were violated by his exclusion from sidebar conferences even though he did not allege that he would have conducted the conference differently than did the standby attorney who participated). *Faretta* grants defendants the right not only to manage, but also to conduct, their own defenses, *see* 422 U.S. at 816-17, 834, a right that *McKaskle* recognized as focusing "on whether the defendant had a fair chance to present his case in his own way." 465 U.S. at 177. Given *McKaskle*'s references to the defendant's right "to have his voice heard," *id.* at 174, and to "speak" for himself, *id.* at 177, an advisory attorney's appearance is not automatically an acceptable substitute for the defendant's as to matters of importance.

For similar reasons, Lamb's solo participation in the chambers conference was not constitutional simply because the record contains no objection by Frantz. The parties do not dispute that the trial court found Frantz competent to represent himself. Nor do they dispute that, despite the appointment of advisory counsel, the trial began with the understanding that Frantz alone was directing his representation at the trial. Under such circumstances, *McKaskle* makes clear that —

absent some basis for concluding that Frantz consented to representation by Lamb as to the particular matter — Frantz's *Faretta* right remained intact. *McKaskle* does not place the burden on *pro se* defendants to regulate each of their standby attorneys' actions. To the contrary, *McKaskle* limits standby counsel's "*unsolicited* participation" during critical proceedings. 465 U.S. at 177 (emphasis added). When standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for the routine matters mentioned in *McKaskle* is "over the defendant's objection." *Id.* at 178; *see generally United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir. 1985) (A defendant's assertion of "the right [to self-representation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.' This, under *McKaskle*'s analysis, must be given effect as a reassertion of the general right to pro se representation as to further proceedings . . . ."). Moreover, Frantz, according to the government was in "lock-up" during the conference, so it is particularly unlikely that implied consent can be inferred from the failure to object. As far as appears on the current record, Frantz was never in the presence of the judge after the jury had retired, so he could not have raised an objection to him.

*McKaskle*'s rules are not, however, without exception. *Faretta* established that standby attorneys can assist *pro se* defendants "if and when" their help is requested. 422 U.S. at 834 n.46. And *McKaskle* further explained *Faretta* by cautioning that

> "[i]n measuring standby counsel's involvement against the [*McKaskle*] standards . . . it is important not to lose sight of the defendant's own conduct. A defendant can waive his *Faretta* rights. . . . A defendant . . . who vehemently objects at the beginning of trial to standby counsel's very presence in the court-

room, may express quite different views as the trial progresses."

*McKaskle*, 465 U.S. at 182. It is this exception that we must investigate further to determine whether Frantz merits relief. Absent consent by Frantz, his exclusion from the chambers conference was unconstitutional, for all the reasons we described above.

More specifically, *McKaskle* refers to two types of permissible consent to a standby attorney's participation. The first is express approval for a particular action. Participation by a standby attorney under such circumstances "is, of course, constitutionally unobjectionable. A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense." *Id.* The second type of consent is implied: "Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of[,] or acquiescence in[,] certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably." *Id.* Thus, *McKaskle* concluded, "[o]nce a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183 (emphasis added).

**[17]** Implicit consent from the overall course of the trial proceedings appears unlikely. Frantz asserted that his right to self-representation extended to all matters involving jury instructions. During trial, Frantz fully participated in the primary discussion regarding final jury instructions. Although Lamb made one request during that discussion, Frantz made an entirely separate request, arguing at length concerning why the instructions should address assault as a lesser included offense and responding to the judge's queries on his proposal.

The bench conferences in which Frantz did not participate did not concern jury instructions; although they did concern some evidentiary questions, Lamb was always within consulting distance of Frantz and did sometimes consult with him during the conference.

Nevertheless, our record is far from complete. We know that Frantz declared under oath that "[o]n the final day of trial . . . advisory counsel, Ray Lamb, did not tell [him] the jury wanted to hear [the] 911 tapes, nor to have them played to the jury." But we have no specific evidence concerning the circumstances that gave rise to Lamb's solo participation in the chambers conference concerning the jury's request. The parties did not develop the relevant factual record in state court because the state trial court decided Frantz's *McKaskle* claim on summary adjudication, concluding that no facts were necessary. The state court of appeals rejected that conclusion but then went on, incorrectly, to find any *McKaskle* error harmless. As a result, the failure to hold an evidentiary hearing in state court was not in any way the fault of the petitioner. The hearing should be held now.

**[18]** We thus remand to the district court for an evidentiary hearing concerning the circumstances during the course of the trial and after the jury retired that gave rise to Frantz's exclusion from the chambers conference, including whether Frantz was accurately informed of the purpose of the conference and given the opportunity to appear but declined to do so, and for a determination consistent with this opinion regarding whether Frantz's *Faretta/McKaskle* rights to self-representation were violated by that exclusion. *See* § 2254(e)(2).

## CONCLUSION

We conclude that, in addition to contradicting the clearly established law of the Supreme Court, *see* § 2254(d)(1), the decision of the Arizona Court of Appeals may have resulted

in a denial of Frantz's constitutional right to represent himself, but the record before us is insufficient to resolve the issue fully. Because this court concludes in a separate disposition that Frantz's other claims are not meritorious, we reverse the district court's denial of Frantz's petition and remand for an evidentiary hearing on the consent question described above.

**REVERSED AND REMANDED.**

---

KOZINSKI, Chief Judge, with whom Judges WARDLAW, PAEZ and BEA join, concurring:

Judge Gould spends much effort proving something that no one disputes: That a criminal defendant who represents himself may use standby counsel to take certain actions on his behalf. Judge Gould's worry that we are "hostile to the ability of a pro se defendant to delegate trial tasks to standby counsel," Gould Concurrence at 755, is entirely unfounded. Cases where a pro se defendant *voluntarily* delegates tasks that he could perform himself remain unaffected by today's opinion, which turns on a very different question: Whether petitioner was allowed to appear at the bench conference to speak for himself—as he was entitled to do under *Faretta* v. *California*, 422 U.S. 806 (1975), and *McKaskle* v. *Wiggins*, 465 U.S. 168 (1984)—or whether he was forced to communicate only through standby counsel?

On this record, this is hardly a trivial issue. Consideration of a jury note in the midst of deliberations is a critical stage of the proceedings where both sides are entitled to express their views. *See McKaskle*, 465 U.S. at 178. When the jury sent its note, petitioner was not in court but was being held in custody elsewhere. Frantz's trial judge thus had a responsibility to have Frantz brought before him for the bench conference. Frantz, after all, was counsel for the defense. The

prosecutor was invited to appear and did so; defense counsel —in this case Frantz—had an equal right to be there. But Frantz could not get there on his own: A prisoner in lockup has no choice about whether to come into court. If the judge orders him to appear, he is slapped into manacles and brought in, like it or not; if the judge does not order him to appear, the prisoner remains in his cell, no matter how badly he may want to go before the judge. Frantz's absence suggests that the trial judge probably denied petitioner his right to self-representation by failing to have him brought from his cell to participate in the bench conference.

It is conceivable that the judge here sent Frantz a message inviting him to come if he wished, and Frantz chose to remain in his cell and speak through Lamb instead. Judges seldom send prisoners engraved invitations with stamped RSVP cards, but maybe this judge was uncommonly polite and considerate. If Frantz was given the option of attending and chose not to, then there is no *Faretta* or *McKaskle* issue because Frantz would have given up his right to appear pro se at the bench conference. This is at least a theoretical possibility, and the district court on remand can easily resolve it by taking evidence on the narrow question of whether Frantz's absence was the result of his voluntary decision to remain in his cell and communicate through his standby counsel, or was forced on him by the judge's wrongful failure to order Frantz brought before him.

And this is why the question that the concurrence finds dispositive—whether Frantz authorized Lamb to speak for him at the conference, Gould Concurrence at 754, 755—is actually beside the point. It doesn't matter whether Frantz authorized Lamb to appear for him, if Frantz had no choice in the matter. If Frantz was not allowed to attend the conference and speak for himself, what else *could* he do except speak through Lamb? Frantz's decision to do so, rather than refuse to provide any defense input whatsoever, can hardly be construed as waiving his right under *Faretta* and *McKaskle* to

appear and speak for himself. If Frantz was not allowed to appear, then he was denied his rights under *Faretta*, and the fact that he authorized Lamb to speak for him cannot cure that error—even if Lamb accurately conveyed Frantz's instructions. *See Bittaker* v. *Enomoto*, 587 F.2d 400, 402-03 (9th Cir. 1978) (*Faretta* error is not subject to harmless error doctrine).

Which brings me to the concurring opinion's curious silence on the issue that the majority finds dispositive, namely whether Frantz voluntarily gave up his right to appear at the bench conference. Since the majority sees the issue as pivotal, one would think the concurrence would at least mention it, if only to dispute its significance. But the concurrence says nothing about it, leaving a complete mystery as to what the author of the concurrence, and the judges joining him, think about this issue.

The concurrence seems to see some virtue in this, suggesting that it is somehow premature to address such issues before the record is further developed. Gould Concurrence at 756-57. I find this very strange, because the concurrence is not the least bit coy about expressing views on any number of legal issues that turn on facts not yet found: "*If* Frantz told standby counsel how to handle the bench conference concerning the jury's question about reading the 911 tape, then there is simply no *Faretta* violation whatsoever because a self-representing defendant may properly use standby counsel to assist in defense. Similarly, *if* Frantz directed standby counsel concerning the conference, then there is no *McKaskle* issue because *McKaskle* merely sets guidelines for when standby counsel may act without the assent of the self-representing defendant." Gould Concurrence at 745-755 (emphasis added). And again: "In my view, *so long as* Frantz adequately instructed Lamb concerning the tape, there is no violation." *Id.* at 746 (emphasis added). And yet again: "There is no *McKaskle* error *if* Lamb had received Frantz's authority to speak at the conference." *Id.* (emphasis added). And still yet again: "*If* Lamb was authorized by Frantz to attend the conference

and state his position on the 911 tape, then there is no issue under *Faretta* or *McKaskle*." *Id.* at 756 (emphasis added).

Of course, there's nothing wrong with this; appellate opinions usually discuss the facts and the law applicable to the case. The quaint notion that we may not properly discuss the law until the district court finds the facts is contradicted not only by common sense and common experience but by the concurrence's own exuberant willingness to express legal conclusions based on hypothetical facts. It also raises some difficult questions, such as: How is the district court to know what facts it needs to find, and how are the parties to know what evidence to present, unless we explain to them the applicable legal theory?

If we are dissatisfied with the district court's fact-finding the first time around, we must tell the judge and the parties what facts matter and, thus, what they are to do on remand. To this end, we must adopt the legal framework pursuant to which further proceedings are to be conducted. Or, to come at it from the other direction: If we ask the district court to find facts without first determining that those facts are of legal significance, aren't we asking the district judge and the parties to engage in a futile exercise? Should we be free, as the concurrence seems to believe, to say to the district court and the parties after remand, "sorry to have bothered you, but all those facts you found at our direction turn out to be of no legal significance after all"?

No responsible appellate court would say anything like that. If we wish the district court and the parties to conduct another trial, that's our prerogative, but we must tell them what facts matter and why. And to do that, we must develop a legal theory that differentiates the legally significant facts from the trivial ones. There is nothing premature or theoretical about this; it's what appellate courts do all the time. If our concurring colleagues disagree with the majority's key legal ruling, that it is dispositive whether Frantz was allowed to

attend the bench conference in the flesh, they should say so forthrightly and explain why. This magisterial gesture of refusing to express a view as to selected legal issues, unless and until the parties and the district court find facts that may turn out to be irrelevant, is not judicial restraint; it is disregard for the time and effort of the other players in the system.

Contrary to the suggestion in the concurrence, Judge Berzon's opinion expresses no hypothetical views, nor is its discussion in the least premature. Rather, the opinion correctly applies the law with a commendable economy of analysis. I am pleased to join it.

GOULD, Circuit Judge, with whom Judges O'SCANNLAIN, RYMER, SILVERMAN, CALLAHAN, and IKUTA join, concurring in Part II and in the result:

Although I am in agreement with the majority that an evidentiary hearing is necessary to determine what was said or decided between the Appellant-Defendant, Karl Frantz, and his standby counsel, Raymond Lamb, in advance of the *in camera* conference to address the jury's request to hear the 911 tape, I write separately because I conclude the majority's rationale is unduly complicated, and intimates conclusions about the scope of the right of self-representation under *Faretta v. California*, 422 U.S. 806 (1975) and *McKaskle v. Wiggins*, 465 U.S. 168 (1984), without knowledge of the predicate facts.[1]

---

[1] I have a concern whether the majority's discussion of the scope of review in Part II of the majority opinion is, in a practical sense, necessary at this stage. Simply stated, if on remand it is determined that Lamb attended the bench conference and acted there with Frantz's specific direction and approval, Frantz would have no basis for relief under either the AEDPA standard, 22 U.S.C. § 2254(d), or a de novo review of the issue not addressed by the state court. In this sense, the majority's expatiation on the scope of review might appear to be gratuitous. However, I join Part II because I agree with the substantive analysis and because our prior cases on this issue are somewhat in disarray, yielding a value for the en banc court to resolve the issue.

Frantz was arrested in Arizona on August 31, 1998, after he allegedly walked into a fast-food restaurant, demanded all the money in the register from cashier Diana Villalobos, threatened to kill Villalobos if she did not hand over the money, and finally lifted his shirt to reveal a handgun tucked in the waistband of his pants. The police were called, Frantz left, and shortly thereafter, not far from the restaurant, the police picked up Frantz, who matched the description provided by Villalobos, but the alleged handgun was never recovered. Frantz was subsequently indicted for attempted armed robbery. After his initial appointed counsel moved to withdraw, Frantz elected to represent himself and waived appointed counsel. After a hearing, the trial court found Frantz competent to represent himself and appointed Lamb as advisory (standby) counsel.

During a two-day jury trial, Frantz admitted that he had been present at the restaurant, but argued that he was unarmed and that the cashier misinterpreted his actions. Frantz delivered a brief opening statement, examined witnesses, and gave a closing argument. The trial court imposed a restriction that Frantz remain seated to minimize any prejudice where, for security reasons, the trial court had previously found that Frantz needed to be shackled during the proceedings because Villalobos had expressed fear of facing him in the court room. To mitigate any unfairness, the prosecution was likewise required to remain seated while it put on its case. Otherwise during the trial, to facilitate admitting items into evidence and the use of exhibits, the trial judge permitted Lamb to approach the bench or the witness stand at Frantz's direction. Also due to the shackling issue, Lamb participated at sidebar conferences. In addition, Lamb occasionally assisted with objections and offered suggestions about overcoming momentary impasses while Frantz questioned witnesses. During the trial, the trial judge referred to Frantz as "Counsel" or "Mr. Frantz."

After the parties rested and the case was submitted to the jury, the jury requested that it be permitted to hear the 911 tape that recorded the restaurant manager's call to the police, in which the manager relayed the firsthand account by Villalobos, who was on the floor of the restaurant at the time, that Frantz was armed and threatening to shoot people if he was not given money. During trial, Frantz had twice sought to admit this tape because the manager also made reference in the call to Frantz as "blond" (again based on Villalobos's account) though Frantz describes himself as having "gray" hair, a purported inconsistency that Frantz believed was exculpatory despite the fact that he asserted no misidentification defense. The trial court initially had rejected Frantz's motions, apparently on grounds that the tape was hearsay because the manager was not in a position to see Frantz and was only relaying Villalobos's account.[2] Although the trial court was ultimately prepared to admit the tape upon a third motion, Frantz then withdrew his request for unknown reasons.

The jury's request to hear the tape during its deliberation necessitated an *in camera* conference. At the time, Frantz was in a holding cell awaiting the verdict, and Lamb attended the conference. The prosecution had no objection to playing the tape and the trial judge appears to have been willing to let the jury hear it, but Lamb told the trial judge that Frantz "doesn't want it in." Frantz and the State now give conflicting accounts as to whether Lamb told Frantz that the jury wanted to hear the tape; whether, if so, the request was fully explained; and whether Frantz told Lamb that he did not want the jury to hear the tape. In any event, without hearing the tape, the jury convicted Frantz.

---

[2] I say "apparently" because the state trial court did not make an explicit ruling grounding the exclusion of the evidence on the hearsay rule, although before rejecting Frantz's request the tape be admitted the state trial court expressed concerns that it was hearsay.

The majority rightly concludes that remand is necessary to determine what transpired between Frantz and Lamb. In *Faretta*, the Supreme Court considered a rejection of a defendant's request to represent himself where the trial court relied on California Supreme Court precedent holding that a criminal defendant had no right to self-representation under the state and federal constitutions. 422 U.S. at 809-12, 810 n.4, 811 n.6. This posed a dilemma for the Supreme Court because its prior precedents in *Argersinger v. Hamlin*, 407 U.S. 25 (1972), *Gideon v. Wainwright*, 372 U.S. 335 (1963), *Johnson v. Zerbst*, 304 U.S. 458 (1938), and *Powell v. Alabama*, 287 U.S. 45 (1932), consistently had held that "the help of a lawyer is essential to assure the defendant a fair trial." *Faretta*, 422 U.S. at 832-33. In *Faretta*, however, the Supreme Court concluded that an independent right to self-representation was implied in the text, structure, and history of the Sixth Amendment. *Id.* at 818-32. The Supreme Court, in balancing these constitutional considerations, required that a criminal defendant, who elects to represent himself or herself, must "knowingly and intelligently" waive the benefits of a right to counsel. *Id.* at 835 (internal quotation marks omitted).

As for the structure of the Sixth Amendment, the Supreme Court held that the "compact statement of the rights necessary for a full defense . . . is given directly to the accused," and not counsel, which provides for a personal right to defend oneself because it is the defendant "who suffers the consequences if the defense fails." *See id.* 818-19. From this structure, the Supreme Court further concluded that "the language and the spirit of the Sixth Amendment contemplate that counsel, like other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant . . . ." *Id.* at 820. Historically, many colonies had recognized a right of self-representation, and it was probably in those days hard to imagine the idea that the state would forbid a person from representing himself. *See id.* at 832. In the long course of English common law history, a right of self-representation had been denied only in the dreaded Star Chamber that was at its height during the Tudor

and Stuart monarchies. *Id.* at 821 n.17. In view of this history, the Supreme Court reasoned that to "force a lawyer on a defendant can only lead him to believe that the law contrives against him." *Id.* at 834.

Although the Supreme Court observed that a defendant representing himself or herself would likely not do as well as one aided by counsel, it upheld the right of self-representation despite such consequences because of the respect for the individual that animated the law. *Id.* Three justices expressed a contrary view in dissent, but the *Faretta* right of self-representation has thus far withstood the test of time.

In *Faretta*, the Supreme Court left open what role might be taken by standby counsel. *See id.* at 834 n.46 ("Of course, a State may — even over objection by the accused — appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.").

In *McKaskle v. Wiggins*, the Supreme Court developed the contours of the standby counsel's role in relation to the defendant's *Faretta* right to proceed *pro se*, in instances where the standby counsel's help was not requested by the self-represented defendant, concluding that "*Faretta*'s logic . . . indicate[s] that no absolute bar on standby counsel's *unsolicited* participation is appropriate or was intended." 465 U.S. 168, 176 (1984) (emphasis added). As the majority recognizes, even unrequested participation by standby counsel outside the presence of the jury is permissible as long as this participation does not subvert the core principles that undergird the *Faretta* right:

> [T]he *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. . . . If standby counsel's participation over the defendant's objection effectively allows counsel to

make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, *or to speak instead of the defendant* on any matter of importance, the *Faretta* right is eroded.
. . .

Thus, *Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel.

*Id.* at 178-79 (emphasis added). In short, the right to self-representation under *Faretta* and *McKaskle* may be violated by overly intrusive "unsolicited participation" by counsel, *see id.* at 183, or if "*disagreements*" between the defendant and standby counsel are not resolved in the defendant's favor. *See id.* at 179 (emphasis added). But if a *pro se* defendant and a willing standby counsel are in agreement regarding trial strategy, I do not read *McKaskle* as limiting the defendant's ability to delegate any chores of trial to standby counsel. That seems to be the result contemplated by *Faretta* itself, which anticipated standby counsel's use when, and to the extent, a *pro se* defendant requests help. *See Faretta*, 422 U.S. at 834 n.46.

I agree with the majority that at this stage in the proceedings, and absent an evidentiary hearing, we may not disregard the State's factual assertions that Lamb acted under Frantz's direction and with Frantz's consent at the *in camera* conference. Although the record before the district court does not provide a clear picture of any consultation between Lamb and Frantz, the state court in a minute order made an express finding in the post-conviction context that after the jury requested to hear the 911 tape, and before advising the trial court of Frantz's position, "[a]dvisory counsel consulted with the Peti-

tioner and advised the court that the Petitioner did not wish the tape to be played." It is true that Frantz had twice sought to admit the 911 tape during the trial, but as the majority points out, Frantz ultimately withdrew this request. That Frantz did not want the 911 tape in evidence before the case was submitted to the jury is consistent with Lamb's portrayal of Frantz's view at the *in camera* conference. Like the state court's minute order, the federal district court also made a specific finding that: "Advisory counsel consulted with Petitioner and told the court that the petitioner did not want the tape to be played."

The significant import of these findings — that some consultation took place — is supported by Frantz's own inconsistent statements in his state petition for post-conviction relief and need not be invalidated because the Court of Appeals of Arizona later reversed the trial court's summary denial of Frantz's *McKaskle* claim as "improperly based." In reversing, the appellate court noted that Frantz attached an affidavit to the petition, dated January 3, 2002, which stated that "advisory counsel, Ray Lamb, did not tell me the jury wanted to hear the 911 tapes, nor to have them played to the jury." It is no doubt correct, as the Arizona appellate court concluded, that Frantz asserted a "colorable" claim in light of his affidavit, which the Pima County trial court should not have summarily denied.

The Arizona appellate court erred by denying Frantz's *Faretta* claim under harmless error analysis instead of first determining the facts and then using structural error analysis, if the *Faretta* right was violated. *See McKaskle*, 465, U.S. at 177. The appellate court should have remanded to the Pima County trial court for an evidentiary hearing which would have made clear whether the *Faretta* right was or was not violated. Indeed, this case now requires no complex analysis: If Frantz told standby counsel how to handle the bench conference concerning the jury's question about reading the 911 tape, then there is simply no *Faretta* violation whatsoever

because a self-representing defendant may properly use standby counsel to assist in defense. Similarly, if Frantz directed standby counsel concerning the conference, then there is no *McKaskle* issue because *McKaskle* merely sets guidelines for when standby counsel may act without the assent of the self-representing defendant.

I have a sense of unease about the majority opinion, insofar as it may read *McKaskle* too expansively. In a case where a self-representing defendant has directed standby counsel to assist, *McKaskle* does not require that a criminal must "speak for himself," as the majority appears to characterize that case. *See Majority Opinion* at 740. Instead, *McKaskle* imposes its limits on the "*unsolicited* participation" of standby counsel. 465 U.S. at 178 (emphasis added). This rule suggests that standby counsel may not usurp the role of the *pro se* defendant who otherwise wants to participate directly in some stage of the proceedings. *McKaskle* does not prohibit a criminal defendant from delegating certain tasks to standby counsel. *See id.* ("[T]he objectives underlying the right to proceed pro se may be undermined by *unsolicited* and excessively intrusive participation by standby counsel.") (emphasis added). *Cf. United States v. Mills*, 895 F.2d 897, 903 (2d Cir. 1990) (recognizing that *Faretta* right was not eroded where *pro se* defendant conceded that standby counsel took no "action that was not authorized by Mills or adopted any strategy or position that was not initiated by Mills").

I part company with the majority's rationale insofar as it suggests that if Frantz had told Lamb what to do about the tape, but had not explicitly addressed participation in the chambers conference, there would be a violation of *Faretta* and *McKaskle*. In my view, so long as Frantz adequately instructed Lamb concerning the tape, there is no violation. We should not be hostile to the ability of a pro se defendant to delegate trial tasks to standby counsel. I also part company with the majority's rationale insofar as it says that there "may have been" a *Faretta* and *McKaskle* violation without recog-

nizing that there may well not have been. We would be better advised to determine difficult legal issues with the predicate issues fully developed, rather than indulging in a bias toward a particular result before the trial court has engaged in the necessary fact finding.

Here, Lamb participated in all the sidebar conferences without Frantz, which the trial judge deemed necessary for security reasons, without objection from Frantz. Given the absence of pertinent evidence, Frantz may well have delegated to Lamb the responsibility of attending the *in camera* conference and conveying his position that the 911 tape not be given to the jury. That is indeed what counsel Lamb says occurred. There is no *McKaskle* error if Lamb had received Frantz's authority to speak at the conference. The record in its current state just does not inform us adequately about the circumstances of Frantz's absence from the *in camera* conference. But an evidentiary hearing is being ordered for exactly these reasons — to fill in the gaps in the record and resolve the competing factual accounts. That being so, I am at a loss to understand why the majority wishes to speak at length on what may be the case, rather than awaiting the factual determinations that are being ordered and then assessing the law of *Faretta* and *McKaskle* in light of the determined facts.

The majority seems to suggest that even if Frantz consulted with Lamb about the jury's request, Lamb might not be able to participate in the conference without infringing Frantz's rights to self-representation. Again, I think a simple analysis is dispositive: If Lamb was authorized by Frantz to attend the conference and state his position on the 911 tape, then there is no issue under *Faretta* or *McKaskle*. Conversely, if Lamb accurately conveyed the position of Frantz on the tape, but Frantz had not asked Lamb to attend the conference, then a square issue is presented whether standby counsel's bench conference attendance offends *Faretta* and *McKaskle*. In my view, that issue should be reached, if required, after the relevant facts are fully determined. I cannot join the majority, in

part, because it insists on elaborating on such issues prematurely. *See Majority Opinion* at 736 ("Frantz's exclusion resulted in a *complete silencing* of Frantz's voice on the matters.") (emphasis added).

If the majority is suggesting that Frantz could not use Lamb at the bench conference, then that position misinterprets the permissible role of a standby counsel, who may handle any duties delegated by a self-representing defendant.[3] Instead, the defendant is representing himself or herself when he or she delegates a task to a standby counsel and assents to being assisted to that extent.[4]

We should keep in mind that broadly speaking, there are two distinct purposes of a standby counsel. One is to "stand by" and be ready to proceed if the defendant should choose to cease self-representation, or if there is any other reason why self-representation cannot continue. The second purpose of a standby counsel is to help a self-representing defendant if, and to the extent, assistance is requested. As discussed above, the Supreme Court in *Faretta* expressly recognized both these applications, *see* 422 U.S. at 834 n.46, even though

---

[3]In such a case, no formal waiver analysis is required, because there is no affront to the scope of self representation recognized in *Faretta*. When a self-representing defendant requests the assistance of an available standby counsel, courts have not required a separate "waiver" analysis before each and every task is delegated by a defendant to a standby counsel. There must be a knowing waiver of the right to counsel before self-representation can proceed, but in *Faretta*, sensitive to the undeniable fact that many self-representations would be detrimental to the accused without the guiding light of counsel, the *Faretta* court made it as clear as can be that the state could provide a standby counsel. When a self-representing defendant asks a standby counsel to handle anything, there is no need to burden the court procedures with a task-oriented waiver analysis.

[4]Whether or not this kind of delegation might be characterized as "hybrid" representation, the Supreme Court has considered it permissible even though a *pro se* defendant may not insist on it by right. *See McKaskle*, 465 U.S. at 183 ("*Faretta* does not require a trial judge to permit 'hybrid' representation of the type Wiggins was actually allowed.").

it left the precise scope of standby counsel's role not fully charted. In the wake of *Faretta*, however, federal courts have adopted both these rules in delineating standby counsel's role. *See*, *e.g.*, *United States v. Gomez-Rosario*, 418 F.3d 90, 96-97, 102 (1st Cir. 2005) (holding that district court could, consistent with *Faretta*, require that standby counsel screen *pro se* defendant's motions to "facilitate the orderly functioning of the proceedings" after the unassisted defendant deluged the district court with nearly 100 long and frivolous motions); *United States v. Lawrence*, 161 F.3d 250, 252 (4th Cir. 1998) (recognizing, where standby counsel was initially restricted to procedural matters only and self-representing defendant suddenly decided to absent himself from court room at the outset of trial, that standby counsel's role could be extended "to include a substantive discussion of the implications of waiving his right to be present at his own trial"); *United States v. Tarantino*, 846 F.2d 1384, 1420 (D.C. Cir. 1988) (acknowledging implicitly defendant's ability to delegate tasks to standby counsel within district court's discretionary authority to accept "some sort of hybrid form of representation, whereby both he and his appointed counsel would be permitted to examine witnesses, make objections, and argue motions," even though defendant "did not have a constitutional right under the Sixth Amendment to combine self-representation with representation by counsel"). The key inquiries under *Faretta* and *McKaskle* hinge on the uncertain factual questions of whether Frantz objected to his exclusion from the *in camera* conference, and whether he requested or consented to the position Lamb conveyed there. If Lamb accurately relayed Frantz's position, and if Frantz asked Lamb to attend the bench conference, the role of standby counsel at that point concerned only the task of informing the trial court that Frantz did not wish to have the 911 tape played. Viewed in this light, Lamb's ancillary assistance to the trial judge in fashioning a response to deny the jury's request can be considered akin to one of "overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to tes-

timony, that the defendant has clearly shown he wishes to complete." *McKaskle*, 465 U.S. at 183.

The Supreme Court in *McKaskle* held that a *Faretta* error is structural and that it cannot be shown to be harmless. *See* 465, U.S. at 177. Because the Supreme Court reasoned in *Faretta* that self-representation would often be to the detriment of a defendant, *see* 422 U.S. at 834, it would destroy the right if, after the fact of denial, courts could simply find that the defendant was not harmed because he or she would have done better with counsel. Here, it would not be *Faretta* or *McKaskle* error if, in an evidentiary hearing, it were determined that Frantz had consented to standby counsel Lamb's handling the *in camera* conference at Frantz's direction. On the other hand, because the conference was an important stage of the proceedings, if Frantz did not direct Lamb to handle the conference for him, but merely gave him his views on the 911 tape, then a square and difficult issue will be presented whether Frantz's *Faretta* rights, as clarified in *McKaskle*, were violated.

*Faretta* and *McKaskle* strike a delicate balance between the probable negative impact of self-representation on the quality of a defense, and the superordinate interest in honoring the respect for individual choice that animated *Faretta*. Thus, if Frantz chose to communicate a position through standby counsel Lamb at the bench conference, that choice should be respected.

I would remand for the required fact determinations, and then address the *Faretta* and *McKaskle* issues in the light of determined facts.